IN THE COURT OF APPEALS OF TENNESSEE,
AT JACKSON

FILED

March 26, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

)
PATRICIA K. REED,                          )
                                           )
   Plaintiff/Appellant.                  )
                                           )
VS.                                        )       C.A. No. 02A01-9802-CV-00032
                                           )
ALAMO RENT-A-CAR, INC.,                    )
                                           )
   Defendant/Appellee.                   )
                                           )

From the Circuit Court of Shelby County at Memphis.
**Honorable Kay S. Robilio, Judge**

**John R. Smith**,
BROWN, BRASHER & SMITH, Memphis, Tennessee
Attorney for Plaintiff/Appellant.

**Roane Waring, III**,
SHUTTLEWORTH, SMITH, WILLIAMS, SABBATINI & HARPER, Memphis, Tennessee
Attorney for Defendant/Appellee.

OPINION FILED:

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED**

**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**LILLARD, J.**: (Concurs)

Plaintiff Patricia K. Reed appeals the trial court's judgment dismissing her claims for retaliatory discharge and breach of employment contract against Defendant/Appellee Alamo Rent-A-Car, Inc. We affirm the trial court's dismissal of Reed's retaliatory discharge claim, but we reverse the court's dismissal of Reed's claim for breach of employment contract, and we remand for further proceedings.

### I. Factual and Procedural History

Reed worked for Alamo Rent-A-Car from June 1990 to December 1994. During this time, Reed received good job evaluations and, on more than one occasion, was named Alamo's employee of the month. Reed's most recent job evaluation indicated that her performance was between "above average" and "outstanding."

On March 13, 1993, Reed injured her knee at work when she slipped on some ice and fell. Reed's injury caused her to miss approximately one month of work. After returning to work in April 1993, Reed resumed her duties as a rental agent supervisor. Reed continued to experience difficulty with her injured knee, however, and she was required to undergo knee surgery on October 4, 1994.

At the time of her surgery, Reed requested permission to take a leave of absence under the Family and Medical Leave Act (FMLA). *See* 29 U.S.C. §§ 2601--2654 (1994). Reed's manager, Dick Snyder, initially approved Reed's request to be off work from October 5, 1994, to November 20, 1994. When the request was submitted to Alamo's corporate offices in Fort Lauderdale, Florida, however, Alamo's Family Wellness Department denied Reed's request for FMLA leave because Reed already was on leave for her on-the-job injury, during which time she was receiving workers' compensation benefits.

On November 16, 1994, Reed visited her doctor's office for a scheduled checkup. At that time, Dr. Robert L. Bourland, Jr., signed a certificate authorizing Reed to be off work until December 14, 1994. Shortly after Reed's visit, however, a representative of CNA Insurance Company, Alamo's workers' compensation carrier, contacted Dr. Bourland, apparently to inquire

about the possibility of releasing Reed to return to light duty work. Dr. Bourland agreed that Reed could return to light duty work, and on November 18, 1994, he signed a release authorizing Reed's return. Dr. Bourland's certificate set forth the following restrictions: "No prolonged standing, walking, bending or stooping." CNA notified Alamo of the release on November 21 or 22, 1994. CNA also ceased paying workers' compensation benefits to Reed.

On November 22, 1994, Diane Bledsoe, Reed's supervisor at Alamo, contacted Reed by telephone and informed her that Dr. Bourland had released her to return to light duty work. Reed expressed confusion and told Bledsoe that she understood she was not supposed to return to work until December 14, 1994. Bledsoe instructed Reed to contact Dr. Bourland to see if he had made a mistake in releasing Reed. When Reed contacted her doctor's office, however, a staff member confirmed that Reed had been released for light duty work.

Bledsoe again contacted Reed on November 23, 1994. During this conversation, Bledsoe informed Reed that Alamo expected her to report to work at 4:00 p.m. that day. Upon learning this information, Reed became upset and started crying. Just days previously, Reed had received authorization to be off work until December 14, 1994, and now, one day before Thanksgiving, Alamo was demanding that Reed return to work. Reed also expressed concern about her ability to drive because her injured right leg was the leg she used to drive her car. Reed told Bledsoe that she needed more time to relearn how to drive, and she asked if another Alamo employee could transport her to work.

After checking with Dick Snyder, Bledsoe informed Reed that Alamo would not provide her with transportation to work. Bledsoe also warned Reed that, if she did not report to work on November 23, 1994, Alamo would assume that she was resigning her position. Despite this warning, Reed did not report to work for her shift on November 23.

Instead of terminating Reed, Dick Snyder rescheduled Reed to return to work on November 27, 1994, rather than November 23. When Reed still did not report for work, however, Snyder wrote a letter to Reed, dated December 1, 1994, warning her that she was in violation of Alamo's policy on job abandonment and that Snyder had no other choice but to believe that Reed

had resigned.

Reed received Snyder's letter during the first week of December 1994, and she promptly called Snyder to discuss the matter. When Reed insisted that she did not wish to resign her position but that she still was in great pain and was unable to drive or walk very well, Snyder instructed Reed to try to get another appointment with Dr. Bourland. Snyder indicated that he would wait until after Reed's next appointment before he proceeded with any paperwork, took any disciplinary action, or made any decision.

Although Reed was not scheduled to return to the doctor until December 14, she rescheduled her next appointment for December 7, 1994. At the appointment, however, Dr. Bourland was not responsive to Reed's questions as to why he had released her for light duty work, and he did not provide her with a new certificate authorizing her to be off work as she had hoped. The parties disputed whether Reed contacted Snyder after her December 7 doctor's appointment. On December 13, 1994, however, still having received no authorization for Reed to be off work, Snyder completed the paperwork required by Alamo to terminate Reed's employment.

On December 12, 1995, Reed filed this lawsuit in which she contended that Alamo had discharged her in retaliation for filing a workers' compensation claim. Reed further contended that her discharge breached her employment contract with Alamo, which she claimed was evidenced by a document entitled "My Personal Alamo Family Member Pact" or "FamPact." Finally, Reed contended that Alamo breached section 50-6-123 of the Tennessee Workers' Compensation Law by failing to provide case management services to Reed. Reed's complaint also asserted claims against CNA Insurance Company and Transportation Insurance Company, but these defendants were voluntarily dismissed from the lawsuit by an order entered in June 1996.

After conducting a bench trial, the trial court dismissed Reed's complaint in its entirety. The trial court dismissed Reed's retaliatory discharge claim based upon the one-year statute of limitations for personal injury actions. *See* T.C.A. § 28-3-104(a)(1) (Supp. 1990). The court dismissed Reed's breach of contract claim based on the court's ruling that FamPact did not constitute a part of the parties' employment agreement.

On appeal, Reed presents the following issues for this court's review:

I.      Whether the Trial Court erred in ruling that [Reed] had unequivocal knowledge of a termination decision under the authority of **Weber v. Moses**[1] barring that portion of [Reed's] case involving allegations of retaliatory discharge.

II.     Whether the Trial Court erred in ruling that Fampact was not a contractual agreement by and between [Reed] and [Alamo].

III.    Whether the Trial Court erred in failing to award damages to [Reed] for the violation of Tennessee Code Annotated Sections [50-6-123(b)(2) and (5)], by [Alamo].

Alamo also has raised the following issues:

I.      Whether the Trial Court incorrectly ruled that [the] release language executed by Reed in the order approving her workers compensation settlement did not preclude this action.

II.     Whether Reed failed to carry her burden of establishing a causal connection between her claim for worker compensation benefits and her termination.

## II.  Reed's Claim for Retaliatory Discharge

We first address Reed's contention that the trial court erred in ruling that her claim for retaliatory discharge was barred by the one-year statute of limitations applicable to such claims. *See Headrick v. Union Carbide Corp.*, 825 S.W.2d 424 (Tenn. App. 1991); T.C.A. § 28-3-104(a)(1) (Supp. 1990). In making its ruling, the trial court relied upon our supreme court's decision of *Weber v. Moses*, 938 S.W.2d 387 (Tenn. 1996). In *Weber*, the court held that the one-year limitations period for a retaliatory discharge or discriminatory practice claim commenced when the employee received unequivocal notice that his employer had made a definite and final decision to terminate him. *Weber*, 938 S.W.2d at 392-93. Applying this rule, the court concluded that Weber's claims filed August 31, 1993, were barred because the statute began to run in early August 1992, when Weber was notified of his employer's decision to terminate his sales manager contract, and not on August 31, 1992, when Weber's employment actually ended. *Id*. at 393.

---

[1] *Weber v. Moses*, 938 S.W.2d 387 (Tenn. 1996).

At the conclusion of trial in the present case, the trial court orally summarized its reasons for dismissing Reed's retaliatory discharge claim:

> I believe that she did -- through her oral notice on [November] the 23rd I believe that [the] decision of the company to discharge her was abundantly clear. I believe she understood that. I think she had nothing more than a hope of some kind of redress or a hope of some kind of grievance procedure being put into place, which evidently never really completely occurred. That decision being made, really communicated, the decision that I believe was made before the 23rd was certainly communicated to her on the 23rd is what is controlling under Tennessee law under this [*Weber*] *v. Moses* case.

We conclude that the trial court's ruling on this issue was in error because the undisputed evidence demonstrated that Alamo had not made a final decision to terminate Reed on November 23, 1994. It is true that Reed was informed on November 23, 1994, that if she did not report for work later that day, Alamo would assume that she had resigned her position. Moreover, other evidence presented at trial suggested that Reed believed she indeed had been terminated on that date. The testimony of Alamo's own employees, however, made clear that Reed was not terminated until a later date in December 1994.

After Reed did not report for work on November 23, Reed's manager, Dick Snyder, rescheduled her to return to work on November 27, 1994. On December 1, 1994, when Reed still did not report for work, Snyder wrote her a letter reiterating Alamo's job abandonment policy and stating that he had no alternative but to believe that Reed had resigned her position with Alamo. Reed and Snyder discussed this letter in a telephone conversation during the first week of December 1994. When Reed complained that she was unable to drive, was in great pain, and could not understand why the doctor had released her for light duty, Snyder instructed Reed to try to schedule another appointment with her doctor. Specifically, Snyder testified:

> I agreed with her at that time. I said try to get another appointment and go back to your doctor. If you are unable to proceed, you know, as far as a work schedule, I will wait until after you have done this before I proceed with any paperwork.
>
> . . . .
>
> Or any disciplinary, you know, action.

Snyder later testified that

> So that is when I suggested she go back to the doctor, and after that appointment -- we would hold off any decision making until we find out if in fact she should be coming back to work.

Based on this conversation, Snyder expected Reed to contact him after her doctor's appointment and they "would proceed from that point on."

According to Snyder, this was the last conversation he had with Reed. Reed, however, testified that she spoke with Snyder after her December 7 doctor's appointment. According to Reed, she complained that Dr. Bourland had refused to discuss the release issue with her and, to complicate matters, had placed her in a brace that extended from her hip to her ankle. Snyder reportedly responded by stating that "well, we'll see what happens." In any event, it was undisputed that Snyder completed the necessary paperwork to terminate Reed on December 13, 1994.

Contrary to the trial court's ruling, we conclude that Reed could not have received unequivocal notice of Alamo's termination decision on November 23, 1994, because on that date, no decision had been made to terminate Reed. The undisputed evidence showed that, after that date, Snyder rescheduled Reed's return to work and informed her that he would not make any termination decision or initiate any disciplinary action until after she returned to the doctor's office on December 7. The evidence also showed that Snyder did not actually terminate Reed until December 13, 1994, and that Reed did not receive notice of her termination until sometime after that date. This evidence was consistent with Reed's own testimony that, during their telephone conversation in early December 1994, Snyder assured her that she had not been terminated. Under these circumstances, we conclude that the trial court erred in ruling that the one-year statute of limitations had run by the time Reed filed this lawsuit on December 12, 1995.

In ruling on this issue, the trial court noted that Snyder, who no longer worked for Alamo, was "very hostile toward the company." The court also indicated that it was not influenced

by Snyder's testimony that his December 1 letter to Reed "wasn't a letter of termination." We recognize that the trial court is in the best position to judge the credibility of the witnesses and that, when the court resolves a conflict in testimony in favor of a party, such a determination is "binding on the appellate court unless from other real evidence the appellate court is compelled to conclude to the contrary." *Hudson v. Capps*, 651 S.W.2d 243, 246 (Tenn. App. 1983).

In the present case, however, the evidence really was not disputed. Alamo's own witness, Bobbie Bonavia, testified that Bledsoe and Snyder "extended [the] time that [Reed] could come back to work." In fact, toward the trial's conclusion, even Alamo's attorney agreed that Reed had been granted an extension to return to work during her telephone conversation with Snyder in early December 1994. The undisputed evidence, therefore, showed that Reed was not terminated on November 23, 1994, that she instead was given an extension to attempt to resolve the confusion over her doctor's conflicting reports, and that she later was terminated on December 13, 1994.[2]

We are aware that the evidence was disputed as to whether Snyder talked to Reed after her December 7 doctor's appointment. Reed testified that, when she contacted Snyder after her December 7 appointment, Snyder merely stated that "well, we'll see what happens." Snyder, on the other hand, testified that he did not talk to Reed between December 7 and December 13, when he completed the paperwork to terminate Reed. Based on Snyder's testimony, Alamo could have made the alternative argument that Reed should have had notice of her imminent termination after her doctor's appointment on December 7.

---

[2]On appeal, Alamo relied on Reed's testimony at a prior unemployment compensation hearing to support its contention that Reed was terminated by Alamo on November 23, 1994. At the February 1995 hearing, Reed testified to her belief that she was terminated by Alamo on November 23, 1994. We agree that principles of judicial estoppel may preclude a party from contradicting sworn testimony given in a prior judicial proceeding or from maintaining inconsistent legal positions in judicial proceedings. *See Allen v. Neal*, 396 S.W.2d 344, 346-47 (Tenn. 1965); *Stearns Coal & Lumber Co. v. Jamestown R.R. Co.*, 208 S.W. 334, 334-35 (Tenn. 1919); *Butler v. Butler*, No. 02A01-9702-CH-00038, 1997 WL 576533, at *4 (Tenn. App. Sept. 18, 1997); *but see Mangrum v. Wal-Mart Stores, Inc.*, 950 S.W.2d 33, 37 (Tenn. App. 1997) (holding that T.C.A. § 50-7-304(k) precludes application of collateral estoppel principles in workers' compensation proceedings). We note, however, that Snyder, who represented Alamo at the unemployment compensation hearing, maintained throughout the hearing that Reed was terminated on December 13, 1994, and not on November 23, 1994. Moreover, we note that it was Alamo which injected the statute of limitations defense into this lawsuit and which first attempted to maintain a position inconsistent with the one it assumed at the unemployment compensation hearing.

Nevertheless, we decline to affirm the trial court's ruling on this ground. At trial and on appeal, Alamo consistently has maintained that the one-year limitations period began to run on November 23, 1994, and that the limitations period was triggered by the communications which took place between Bledsoe and Reed on that day. Alamo has not argued that the limitations period could have begun to run on any other date. Inasmuch as the trial court apparently was not asked to consider the later date of December 7, the court did not resolve the conflict between Reed's and Snyder's testimony as to what, if any, conversation transpired between December 7 and December 13.

Because the statute of limitations was an affirmative defense, Alamo had the burden of proving that the statute had run by the time Reed filed this lawsuit on December 12, 1995. *Carr v. Borchers*, 815 S.W.2d 528, 532 (Tenn. App. 1991); *Jones v. Hamilton County*, 405 S.W.2d 775, 779 (Tenn. App. 1965). Based on the undisputed evidence which was presented in this case, we conclude that Alamo failed to meet this burden. Even if Reed subjectively believed on November 23, 1994, that she had been terminated, the testimony of Alamo's own employees indicated that Reed was given an extension to return to work and that a final decision on Reed's termination was postponed until after her December 7, 1994, doctor's appointment. We believe that these facts distinguish the information conveyed to Reed on November 23, 1994, from the termination decision conveyed to Weber in *Weber v. Moses*.

Although we conclude that Alamo failed to meet its burden of proving that the one-year statute of limitations had run when Reed filed this lawsuit, we nevertheless affirm the trial court's dismissal of Reed's wrongful discharge claim. In order to establish a cause of action for discharge in retaliation for asserting a workers' compensation claim, a plaintiff must plead and prove the following elements:

(1)     The plaintiff was an employee of the defendant at the time of the injury;

(2)     the plaintiff made a claim against the defendant for workers' compensation benefits;

(3)     the defendant terminated the plaintiff's employment; and

(4)     the claim for workers' compensation benefits was a

substantial factor in the [defendant's] motivation to terminate the [plaintiff's] employment.

*Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558 (Tenn. 1993).

In the present case, Reed was able to show that she was an employee of Alamo at the time of her injury, that she made a claim against Alamo for workers' compensation benefits, and that Alamo thereafter terminated her employment; however, Reed was unable to establish the final element of her retaliatory discharge claim, that of causation. This court has held that, in order to establish the element of causation, the plaintiff must present some proof other than merely the facts showing her employment, her exercise of rights under the Workers' Compensation Law, and her subsequent discharge. *Thomason v. Better-Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. App. 1992). The plaintiff may accomplish this goal either by presenting direct evidence of the necessary causal link or by introducing compelling circumstantial evidence of such a link. *Id*.

Various courts have considered what type of circumstantial evidence will support the necessary causal link. For example, a plaintiff cannot establish causation by testifying that she cannot think of any other reason for her discharge. *Vaughan v. Harvard Indus., Inc.*, 926 F. Supp. 1340, 1350 (W.D. Tenn. 1996). The plaintiff's subjective beliefs or speculations are insufficient to create the requisite causal relationship. *Id*. (citing *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) (indicating that mere personal beliefs, conjecture, and speculation were insufficient to support inference of age discrimination), *cert. denied*, 480 U.S. 919 (1987)).

Moreover, a plaintiff may not prevail on a wrongful discharge claim merely by showing that a causal connection exists between her on-the-job injury and her subsequent discharge. *Vaughan v. Harvard Indus.*, 926 F. Supp. at 1351. Instead, the plaintiff must show that her claim for workers' compensation benefits, as opposed to her injury, was the true or substantial reason for her discharge. *Id*.; *see also Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn. 1993) (holding that plaintiff failed to establish causal relationship where she testified that she had "been out so long" that her employer "didn't have the time to wait"). And, absent evidence of a discriminatory motive, a plaintiff may not satisfy the causation requirement merely by showing that

her employer required her to return to work over her objection that she was medically unable to work. ***Harris v. American Red Cross***, 752 F. Supp. 737, 740 (W.D. Tex. 1990).

When asked by her attorney why she believed she was terminated by Alamo, Reed gave the following testimony:

> A     I believe in my heart, because to me my dream was to retire with Alamo, that had I not had the surgery and filed workers' comp I would still be employed there, and I wish I was.

Additionally, when questioned on cross-examination as to why she believed she was terminated for filing a workers' compensation claim, Reed gave the following testimony:

> Q     Now, Ms. Reed, in finishing up here, nobody -- never heard anybody from Alamo tell you that the reason you were terminated was because you filed a workers' compensation claim, is that true?
>
> A     They didn't word it that way, no.
>
> Q     And you don't have any evidence or reason to believe that you were terminated because you filed a workers' compensation claim other than the fact that you filed a workers' compensation claim and you were terminated after that, do you?
>
> A     I believe, again, like I repeat myself, I believe in my heart had I not had the surgery or filed workers' comp and had stayed on with Alamo working with my leg the shape it was in, had not had the surgery, I would still be employed there, and I believe that, and I'll die by that.
>
> Q     Okay. But my question is do you have any reason to believe that your termination is related to this workers' compensation claim other than the fact that they chronologically follow one another?
>
> . . . .
>
> A     In answer to your question, for a doctor, a company doctor to tell me one thing on one day, two days later renege on that because he was instructed by my employer at which point they used that to tell me -- to start all of this, I can't help but feel that that is a major reason, and I believe that the doctor's a good example of it when they tell me one thing and just because the company instructs the CNA to call him, him seeing me two days prior and knew the shape I was in, and then two days later all of a sudden he's going to tell the company, yeah, I'll let her come back to work.

In our view, the foregoing contentions by Reed were too speculative to establish the required causation element of a retaliatory discharge claim. For the most part, Reed's testimony merely expressed her subjective belief that she would not have been fired had she not had knee surgery or filed a workers' compensation claim. Reed's subjective beliefs and speculations were insufficient to create the requisite causal relationship of her claim for wrongful discharge. Additionally, Reed's testimony failed to establish that it was her claim for workers' compensation benefits, as opposed to her on-the-job injury, which motivated Alamo to terminate her employment.

To support her belief that Alamo terminated her because she had surgery and because she filed a workers' compensation claim, Reed additionally testified that Alamo had instructed CNA to contact Dr. Bourland and that this contact resulted in Dr. Bourland releasing Reed for light duty work. We conclude, however, that this circumstantial evidence was not sufficiently compelling to support the inference that Reed was terminated for filing a workers' compensation claim. Apparently, it is not uncommon for an employer to contact a doctor who is treating an on-the-job injury, and we know of no prohibition against an employer questioning a doctor as to an employee's progress or availability for work. *See Harris v. American Red Cross*, 752 F. Supp. 737, 738 (W.D. Tex. 1990) (wherein plaintiff was instructed to report to work after employer's chief medical officer reviewed reports of various treating doctors and concluded that plaintiff was medically able to work); *see also Brown v. Southwestern Bell Tel. Co.*, 901 F.2d 1250, 1253 (5th Cir. 1990) (wherein employer's medical advisor asked plaintiff's doctor to reconsider his assessment of plaintiff's disability in light of plaintiff's job duties as maintenance administrator and, unsatisfied with doctor's response, then sought second opinion from another neurologist); *but see Texas Steel Co. v. Douglas*, 533 S.W.2d 111, 117 (Tex. Civ. App. 1976) (wherein defendant's superintendent, after learning that plaintiff had reported on-the-job injury, went out of his way to get doctor treating plaintiff to release him for light duty work even though doctor had advised that plaintiff could not lift more than eight pounds or stoop more than once per hour). Without more, this evidence was insufficient to support Reed's claim for retaliatory discharge.

### III.  Reed's Breach of Contract Claim

We agree, however, with Reed's contention that the trial court erred in dismissing her claim for breach of contract against Alamo.  In her complaint, Reed contended that Alamo's termination of her employment violated the provisions of "FamPact," a document which was signed by the parties in September 1993 and which purported to govern the parties' employment relationship.  Accordingly, this appeal requires us to consider whether FamPact constituted part of the employment contract between the parties.[3]

This court considered a similar issue in ***Rose v. Tipton County Public Works Department***, 953 S.W.2d 690 (Tenn. App. 1997).  In ***Rose***, we explained that

> this Court has recognized that an employee handbook can become a part of an employment contract.  ***Smith v. Morris***, 778 S.W.2d 857, 858 (Tenn. App. 1988) (citing ***Hamby v. Genesco, Inc.***, 627 S.W.2d 373 (Tenn. App. 1981)); *accord Davis v. Connecticut Gen. Life Ins. Co.*, 743 F. Supp. 1273, 1278 (M.D. Tenn. 1990).  In order to constitute a contract, however, the handbook must contain specific language showing the employer's intent to be bound by the handbook's provisions.  ***Smith v. Morris***, 778 S.W.2d at 858.  Unless an employee handbook contains such guarantees or binding commitments, the handbook will not constitute an employment contract.  ***Whittaker v. Care-More, Inc.***, 621 S.W.2d 395, 397 (Tenn. App. 1981).

***Rose***, 953 S.W.2d at 692.

In the present case, the trial court apparently dismissed Reed's breach of contract claim based upon the following reasoning:

> I don't believe that this FAMPACT is anything other than a very touchy, feely, wildly drawn document by some attorney to engender loyalty, which is what, naturally, a company would want of it's employees but I don't believe that it in any way made Ms. Reed anything other than an at-will employee.

---

[3]The statute of limitations for Reed's claim for breach of employment contract was six years. ***See Stone v. Halsell***, 648 S.W.2d 949, 952 (Tenn. App. 1982); T.C.A. § 28-3-109(a)(3) (1980).

We respectfully disagree.  Contrary to the trial court's ruling, the FamPact document executed by Reed and Alamo was not just a loosely-drawn document having no binding legal effect. Rather, the document contained specific language showing Alamo's intent to be bound by FamPact's provisions.  This intent was unequivocally demonstrated by the following language which appeared near the beginning of the document:

>  NOW, THEREFORE, Alamo and I agree to my employment with the company, all on the terms and conditions set forth in this FamPact document:
>
>  1.  FAMPACT.  "FamPact" means Family Member Pact.  It is my personal agreement of employment with Alamo.

This intent was supported further by the document's concluding language:

>  Alamo has written this FamPact, and promises and agrees to:
>
>  -  abide by all its terms and conditions;
>
>  -  provide me competitive pay and benefits, including the benefits of FamPact.
>
>  Alamo and I acknowledge and understand the special relationship created between us by this FamPact.  It is our entire agreement of employment. Alamo's employing me under the terms and conditions of this FamPact, and my working under its terms and conditions, support this agreement.

We believe that this case is controlled by the court's decision in *Hamby v. Genesco, Inc.*, 627 S.W.2d 373 (Tenn. App. 1981).  In *Hamby*, the employer, Genesco, had furnished to each employee a handbook which provided that, as long as the employment relationship continued, the handbook "shall be The Guaranteed Policies, Practices and Procedures of [Genesco]." *Hamby*, 627 S.W.2d at 376.  Based on this language, this court held that the handbook was a part of the contract of employment between Genesco and its employees. *Id*.

We similarly conclude that FamPact was a part of the contract of employment between Alamo and Reed.  As the quoted provisions reveal, FamPact itself indicated that it was the parties' "entire agreement of employment."  Moreover, in executing FamPact, Alamo specifically

promised and agreed to "abide by all its terms and conditions." If anything, this language evidences an even stronger intent to be bound by the document's provisions than the language found in the Genesco handbook.

On appeal, Alamo points out that paragraph 24 of FamPact specifically reserved to Alamo the right to periodically revise FamPact's provisions. In some of its decisions, this court has cited *Claiborne v. Frito-Lay, Inc.*, 718 F. Supp. 1319, 1321 (E.D. Tenn. 1989), for the proposition that an employer's reservation of a unilateral right to modify the provisions of its employee handbook generally precludes the handbook from being considered part of the parties' employment contract. *See Rose v. Tipton County Pub. Works Dep't*, 953 S.W.2d 690, 693-94 (Tenn. App. 1997); *Adcox v. SCT Prods.*, No. 01A01-9703-CV-00123, 1997 WL 638275, at *4 (Tenn. App. Oct. 17, 1997); *Williams v. Memphis Hous. Auth.*, No. 02A01-9608-CV-00190, 1997 WL 287645, at *3 (Tenn. App. June 2, 1997). While we continue to adhere to this proposition, we do not believe that it applies in cases such as this where the employer also has included within its handbook unequivocal language demonstrating its intent to be bound by the handbook's provisions.

In *Adcox v. SCT Products*, No. 01A01-9703-CV-00123, 1997 WL 638275, at *4 (Tenn. App. Oct. 17, 1997), we observed that we could "conceive of no clearer way for an employer to express its intent not to be bound by an employee handbook's provisions than the employer's specific statement that the handbook is not a contract or that the handbook should not be construed as a contract." Conversely, we can conceive of no clearer way for an employer to express its intent to be bound by a handbook's provisions than the employer's specific statement that the document represents the parties "entire agreement of employment" and that the employer "promises and agrees to abide by all its terms and conditions." Accordingly, we conclude that the trial court erred in dismissing Reed's claim for breach of contract based on the court's ruling that FamPact was not a contract.

As with Reed's retaliatory discharge claim, we have considered whether the trial court's judgment dismissing Reed's breach of contract claim can be affirmed on evidentiary grounds. After carefully reviewing the evidence presented at trial, however, we decline to affirm the trial court's judgment on this alternate ground because the record contains evidence from which the trial

court could have found that Alamo breached the provisions of FamPact when it terminated Reed's employment.

Upon Reed's successful completion of her probationary-at-will period, FamPact entitled her to remain employed for a one-year term, which would be renewed annually, unless Reed voluntarily quit her job or was discharged due to a violation of an official Alamo policy, sub-standard job performance, or a decline in the company's revenues or earnings. At trial, Alamo took the position that Reed voluntarily quit her job pursuant to provision 5(a) of FamPact, which stated that an employee could quit her job by, *inter alia*, "engaging in conduct that [made] it apparent that [she was] quitting, such as [her] unexplained failure to report to work." To counter this position, Reed presented evidence from which the fact-finder could have found that Reed's failure to report to work was not unexplained. Specifically, Reed presented evidence that she was physically unable to report to work due to continued swelling, pain, and weakness in her right leg and that she communicated this fact to both Snyder and Bledsoe. Moreover, the undisputed evidence showed that, during her conversations with Snyder and Bledsoe, Reed consistently maintained that she had no intention of resigning her position.

Based on the foregoing evidence, we conclude that the record reveals a genuine dispute as to whether Alamo's discharge of Reed violated FamPact's provisions and that this issue should be resolved by the trier of fact. Inasmuch as the trial court made no findings with regard to this issue, we reverse the trial court's dismissal of Reed's breach of contract claim and remand for a new trial on this claim.

### IV. Reed's Statutory Claim

In addition to her claims for wrongful discharge and breach of contract, Reed also sought to recover damages from Alamo for its alleged violation of section 50-6-123 of the Tennessee Workers' Compensation Law. That section contained the following provisions:

> (a)    No later than January 1, 1993, the commissioner [of labor] shall establish, pursuant to the commissioner's rule and regulation-making authority, a system of case management for

coordinating the medical care services provided to employees claiming benefits under this chapter.

> (b)　All cases anticipated to reach an expenditure threshold or other appropriate point established by the commissioner shall be subject to case management. Such case management shall include, but not be limited to:

> (1)　Developing a treatment plan to provide appropriate medical care services to an injured or disabled employee;

> (2)　Systematically monitoring the treatment rendered and the medical progress of the injured or disabled employee;

> (3)　Assessing whether alternate medical care services are appropriate and delivered in a cost-effective manner based on acceptable medical standards;

> (4)　Ensuring that the injured or disabled employee is following the prescribed medical care plan; and

> (5)　Formulating a plan for return to work with due regard for the employee's recovery and restrictions and limitations, if any.

> (c)　The commissioner may contract with an independent organization, not owned by or affiliated with any carrier authorized to write workers' compensation insurance in the state of Tennessee, to assist with the administration of the provisions of this section.

> (d)　Nothing in this section shall prevent an employer from establishing its own program of case management that meets the guidelines promulgated by the commissioner in rules and regulations.

T.C.A. § 50-6-123 (Supp. 1992). Reed contends that Alamo violated these provisions by failing to systematically monitor Reed's treatment and medical progress and by failing to formulate a plan for Reed's return to work with due regard for her recovery and her restrictions and limitations.

Our supreme court recently addressed the issue of when the provisions of a statute create a private right of action for the statute's violation. In *Premium Finance Corp. v. Crump Insurance Services*, 978 S.W.2d 91 (Tenn. 1998), the court explained:

> Where a right of action is dependent upon the provisions of a statute, our courts are not privileged to create such a right under the guise of liberal interpretation of the statute. *Hogan v. McDaniel*, 204 Tenn. 235, 239, 319 S.W.2d 221, 223 (Tenn. 1958). Only the legislature has authority to create legal rights and interests. Thus, the burden of establishing the existence of a statutory right of action lies with the plaintiff. *Ergon, Inc. v. Amoco Oil Co.*, 966 F. Supp. 577, 585 (W.D. Tenn. 1997).

> In determining whether the legislature intended to grant a

statutory right of action, we begin by examining the language of the statute. If no cause of action is expressly granted therein, then we must determine whether such action was intended by the legislature and thus is implied in the statute. To do this, we consider whether the person asserting the cause of action is within the protection of the statute and is an intended beneficiary. *Carter v. Redmond*, 142 Tenn. 258, 263, 218 S.W. 217, 218 (1920); *Chattanooga Ry. & Lt. Co. v. Bettis*, 139 Tenn. 332, 337, 202 S.W. 70, 71 (1918). The statute's structure and legislative history are helpful in making this determination.

*Premium Fin. Corp.*, 978 S.W.2d at 93.

Contrary to Reed's argument, we conclude that section 50-6-123 did not give her a private right of action against Alamo for negligent case management. We acknowledge that Reed and other workers' compensation claimants are among the intended beneficiaries of section 50-6-123's provisions. The primary duty set forth in section 50-6-123, however, appears to be imposed on the commissioner of labor rather than on employers. To that end, the statute directs the commissioner to establish a system of case management for coordinating the medical care services provided to workers' compensation claimants in cases meeting certain criteria.[4] Although certain responsibilities for case management ultimately may fall on employers,[5] we do not perceive the primary intent of section 50-6-123 to be to impose on employers the duty of case management.

Moreover, we note that the language of section 50-6-123 does not expressly grant a cause of action to an employee against an employer who fails to perform its case management duties in accordance with the guidelines promulgated by the commissioner, and we likewise can discern no implied grant of a cause of action in the statute. Viewed in its entirety, the Workers' Compensation Law provides for governmental enforcement of its provisions. Section 50-6-118, for example, requires the division of workers' compensation of the department of labor to establish and collect penalties for certain violations of the Law, such as an employer's failure to provide coverage,

---

[4]Under the commissioner's rules and regulations, the duty of an employer or insurer to provide case management services arises only if (a) the employee requires inpatient hospitalization, (b) the employee's injury results in medical costs exceeding $10,000, or (c) the employee's lost work time due to the injury reaches a cumulative total of eight weeks of full-time employment. Tenn. Comp. R. & Regs. 0800-2-7-.03(1) (as revised in Feb. 1998).

[5]Specifically, the rules and regulations impose this duty (1) on the insurer, where the employer is insured by a third party, and (2) on the employer, where the employer is self-insured. *See* Tenn. Comp. R. & Regs. 0800-2-7-.02(1)(a) (as revised in Feb. 1998).

the late filing of notices, reports, and judgments, the late payment of benefits, and the bad faith denial of claims. T.C.A. § 50-6-118 (1991). The legislature could have authorized the establishment and collection of penalties for an employer's or insurer's failure to comply with the commissioner's case management rules and regulations,[6] but at this juncture it has not done so. We decline to use the judicial process to engraft additional requirements onto the enforcement scheme designed by the legislature.[7]

### V.  Alamo's Release Defense

As for the final issue raised in this appeal, we reject Alamo's contention that the present action was precluded by the release previously executed by Reed in connection with her workers' compensation action. In settling her workers' compensation claim, Reed agreed to dismiss, discharge, and relieve Alamo "from any and all further liability . . . for the injury resulting from the on-the-job accident of March 13, 1993." Attempting to characterize this language as a "general release," Alamo contends that the release barred Reed's current action against it. Alternatively, Alamo contends that Reed's present claims were expressly barred by the terms of the release because the claims resulted from Reed's on-the-job accident.

As an initial matter, we question whether Alamo waived the defense of release by failing to raise it in a timely manner. A litigant waives an affirmative defense if he fails to raise it in his answer. *Steed Realty v. Oveisi*, 823 S.W.2d 195, 197 (Tenn. App. 1991); *Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin*, 765 S.W.2d 743, 744 (Tenn. App. 1987); T.R.C.P. 8.03, 12.08. In its answer, Alamo did not raise the affirmative defense of release, and Alamo did not move to amend its answer to assert this defense until shortly before the trial began in July 1997. The trial court apparently granted Alamo's motion, but the court did not enter its order permitting Alamo

---

[6]*See* Tenn. Comp. R. & Regs. 0800-2-7-.01 to -.07 (as revised in Feb. 1998).

[7]*But see Clanton v. Cain-Sloan Co.*, 677 S.W.2d 441, 445 (Tenn. 1984) (holding that creation of common-law cause of action for retaliatory discharge, although not explicitly created by Tennessee Workers' Compensation Law, was necessary to enforce employer's duty to compensate employees for work-related injuries, to secure employee's rights to receive such compensation, and to carry out legislature's intention in enacting Law).

to amend its answer until after Reed filed her notice of this appeal.[8]

We recognize that the trial court has the discretion to allow a defendant to amend his answer to assert an affirmative defense, even if such a motion is not made until the time of trial. *Steed Realty*, 823 S.W.2d at 197. The primary factor to be considered by the trial court in making this determination is whether the plaintiff will be unduly prejudiced by the defendant's delay in raising the affirmative defense. *Gardiner v. Word*, 731 S.W.2d 889, 891-92 (Tenn. 1987); *Garthright v. First Tennessee Bank*, 728 S.W.2d 7, 9 (Tenn. App. 1986). In the present case, we are unable to determine why the trial court entered its order granting Alamo's motion to amend its answer to assert the affirmative defense of release, inasmuch as the court's comments at trial suggested that it found Reed was prejudiced by the manner in which Alamo raised this defense.

Nevertheless, we need not decide whether Alamo waived this defense, or whether the trial court abused its discretion in permitting Alamo to amend its answer to assert this defense, because we conclude that the release, by its terms, did not preclude Reed from pursuing claims for retaliatory discharge and breach of employment contract against Alamo. Our supreme court has explained that

> the scope and extent of a release depends on the intent of the parties as expressed in the instrument. A general release covers all claims between the parties which are in existence and within their contemplation; a release confined to particular matters or causes operates to release only such claims as fairly come within the terms of the release. *Glover v. Southern Bell Telephone & Telegraph Co. et al.*, 229 Ga. 874, 195 [S.E.2d] 11 [(1972)]; 76 C.J.S. *Release* § 51, p. 695; 66 Am. Jur. 2d, *Release*, Section 29, p. 706.
>
> . . . .
>
> "A release which is confined or which is construed as being confined to claims or demands arising from, or relating to, a specified matter operates to release all

---

[8]As a general rule, a trial court loses jurisdiction to enter orders in a case after one of the parties files a notice of appeal. *McCormick v. Phillips*, 204 S.W. 636, 636-37 (Tenn. 1918); *Sweetwater Bank & Trust Co. v. Howard*, 66 S.W.2d 225, 228 (Tenn. App. 1932); *Osborne v. Turner*, 1991 WL 26720, at *2 (Tenn. App. Mar. 5, 1991); *but see* T.R.C.P. 54.04(2) (providing that trial court retains jurisdiction over motion for discretionary costs even though party has filed notice of appeal); T.R.C.P. 59.01 (listing authorized motions which will extend trial court's jurisdiction). In the present case, however, the trial court's order merely conformed to her pre-trial ruling on this issue. *See Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888 (Tenn. 1980).

> the particular claims or demands properly embraced in the specifications, but it does not release other claims or demands, . . ." 76 C.J.S. *Release* § 51, p. 696.

*Cross v. Earls*, 517 S.W.2d 751, 752-53 (Tenn. 1974).

In light of the foregoing authority, we disagree with Alamo's characterization of the release in the present case as being a "general release." Rather than generally purporting to settle all claims between the parties, the release specifically sought to settle only Reed's claims "for the injury resulting from the on-the-job accident of March 13, 1993." The order in which this release language appeared was entitled Order Approving Lump Sum Settlement of Worker's Compensation Benefits. The order indicated that the parties wished "to settle and compromise this matter on the basis of payment to [Reed] of permanent partial disability benefits of 30% to the leg, which amounts to the payment of $275.75 per week for a period of 60 weeks, in the total uncommuted amount of $16,545.00." In our view, the plain meaning of the release language that followed was that Reed was relieving Alamo from any further liability for the leg injury she sustained on March 13, 1993. Contrary to Alamo's contention, this language did not relieve Alamo of further liability for any and all claims arising out of the parties' employment relationship.

Our interpretation of the release's language is supported by decisions from other jurisdictions which have narrowly construed release provisions purporting to relieve an employer of further liability for injuries from on-the-job accidents. In *Pope v. Bethesda Health Center, Inc.*, 813 F.2d 1306, 1307 (4th Cir. 1987), for example, Pope released and discharged her former employer "from all other claims of whatsoever kind which might or could hereafter arise under the Workmen's Compensation Law from the said injury, disablement or disability." In rejecting the employer's contention that this release language barred Pope's subsequent claim for wrongful discharge, the court explained:

> We think that the language of this release, examined in its entirety, is clear and unambiguous. It releases and forever discharges Pope's present or future claims arising under the compensation statute "from the said injury, disablement or disability." Application of the release thus depends upon fulfillment of two conditions: first, the claim must "arise" under the Maryland Workmen's Compensation Law, and, second, the claim must be "from the said injury,

disablement or disability." Pope's claim may satisfy the first condition, but we need not reach that issue. ***Pope's claim does not stem from her injury and thus fails to satisfy the second condition. Pope does not allege a cause of action for injury, disablement or disability stemming from an accident in the course of her employment. Rather she alleges a separate, distinct and different cause of action -- her wrongful discharge because she asserted her right to worker's compensation benefits.***

*Pope*, 813 F.2d at 1308 (emphases added).

In ***Bailey v. Martin Brower Co.***, 658 So. 2d 1299 (La. Ct. App. 1995), the plaintiff was injured in an on-the-job accident in July 1991. In September 1991, the plaintiff was terminated by his employer, ostensibly for filing a fraudulent workers' compensation claim. ***Bailey***, 658 So. 2d at 1300. In settling his workers' compensation claim in December 1991, the plaintiff agreed to release his former employer from any and all claims, actions, and causes of action sustained "in consequence of [the] accident that occurred on or about the 21st day of July, 1991." ***Id***. at 1301. Thereafter, the plaintiff filed a wrongful termination suit against the former employer in which he alleged that he was illegally fired for filing a workers' compensation claim. ***Id***. at 1300. In rejecting the employer's argument that the plaintiff's retaliatory discharge claim was barred by the language of the release agreement, the Louisiana appellate court explained:

> We find that given the language employed by the parties in the release agreement, as well as the only testimony on the parties' intent in confecting that agreement, the parties did not intend to release plaintiff's wrongful discharge claim. Although purporting to release [the employer] from "all claims," the language of the release itself focuses on the plaintiff's worker's compensation claim arising on July 21, 1991. The termination, which gave rise to the instant cause of action, did not occur until September 5, 1991. There is nothing in the document pertaining specifically to this separate cause of action, although it was in existence prior to the time that the release was executed. Furthermore, the small consideration given in exchange for the release lends support to the conclusion that the parties intended for the release to only cover plaintiff's compensation claim. Accordingly, . . . the parties did not intend to release plaintiff's retaliatory discharge claim.

***Id***. at 1302; ***cf. Spencer v. Howard, Weil, Labouisse & Friedrichs, Inc.***, 543 So. 2d 547, 551-52 (La. Ct. App.) (reaching different result where plaintiff released defendant for all claims arising out of on-the-job accident "or anything else that may have occurred" to plaintiff while employed by

defendant), *writ denied*, 546 So. 2d 1217 (La. 1989).

In accordance with these authorities, we conclude that the release language in the present case did not bar Reed's claims for wrongful discharge and breach of employment contract. Reed's complaint did not allege a cause of action for injury or disability resulting from her on-the-job accident of March 13, 1993. Rather, Reed alleged separate, distinct, and different causes of action. She alleged that Alamo wrongfully discharged her because she asserted her right to workers' compensation benefits,[9] and she further alleged that Alamo breached the parties' employment contract when it discharged her. Moreover, we note that the language of the release focused on Reed's workers' compensation claim arising due to her March 13, 1993, on-the-job injury. Nothing in the document pertained to the separate causes of action alleged in the present case, although these potential claims existed prior to the time when Reed agreed to the release language. Our conclusion that the release did not bar the present claims is further supported by the fact that the consideration given in exchange for the release pertained only to disability benefits for Reed's March 13, 1993, leg injury.

In contending that the release barred the present claims, Alamo relies on a line of Alabama decisions holding that a retaliatory discharge action was barred by a prior settlement agreement which released the employer from all claims on account of the employee's injury under the Alabama Workmen's Compensation Act "or otherwise." *Gates Rubber Co. v. Cantrell*, 678 So. 2d 754 (Ala. 1996); *Ex parte Aratex Servs., Inc.*, 622 So. 2d 367 (Ala. 1993); *Sanders v. Southern Risk Servs.*, 603 So. 2d 994 (Ala. 1992); *Dow-United Techs. Composite Prods., Inc. v. Webster*, 701 So. 2d 22 (Ala. Civ. App. 1997). We conclude that these decisions are distinguishable from the present case because they dealt with retaliatory discharge claims which, at least arguably, arose under the Alabama Workmen's Compensation Act. In contrast, the release in the present case did not purport to release Alamo from liability for all claims arising under the Tennessee Workers' Compensation Law. Moreover, in the present case, Reed also asserted a claim for breach of employment contract, which did not arise under the Workers' Compensation Law. In any event, to

---

[9]In Tennessee, "[a] claim for damages for retaliatory discharge is not a part of a worker's compensation claim, but is a separate tort action." *Van Cleave v. McKee Baking Co.*, 712 S.W.2d 94, 95 (Tenn. 1986).

the extent that it conflicts with our decision today, we decline to follow the reasoning set forth in the Alabama courts' decisions.

We also conclude that the present case is easily distinguishable from this court's decision in ***Davenport v. Home Federal Bank***, No. 03A01-9401-CV-00034, 1994 WL 287591 (Tenn. App. June 30, 1994), wherein we held that a plaintiff's claim for retaliatory discharge was barred by a prior release executed in connection with the plaintiff's termination from employment. In that case, the plaintiff released the employer "of any and all claims he has or may acquire arising out of or related to his employment." ***Davenport***, 1994 WL 287591, at *1. We reasoned that the plaintiff's subsequent retaliatory discharge claim arose out of or was related to his employment, "and so must be covered by the express terms of the Release." ***Id***., at *6. In contrast, the release in the present case referred only to the injury resulting from Reed's on-the-job accident of March 13, 1993. The release did not purport to cover the parties' entire employment relationship.

## VI. Conclusion

That portion of the trial court's judgment dismissing Reed's claim for breach of employment contract is reversed, and this cause is remanded for further proceedings consistent with this opinion. In all other respects, the trial court's judgment is affirmed. Costs of this appeal are taxed one-half to Reed and one-half to Alamo, for which execution may issue if necessary.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

_____
LILLARD, J. (Concurs)