IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 22, 2018 Session

## LEQUITA NIX HILLIARD v. DOLGENCORP, LLC

**Appeal from the Chancery Court for Polk County**
**No. 2015-CV-22     Jerri S. Bryant, Chancellor**

_____

## No. E2018-00312-COA-R3-CV

_____

Lequita Nix Hilliard ("Plaintiff") sued Dolgencorp, LLC ("Defendant") alleging discrimination in violation of Tenn. Code Ann. § 8-50-103, of the Tennessee Disability Act, and Tenn. Code Ann. § 4-21-311, of the Tennessee Human Rights Act; and retaliatory discharge for filing a worker's compensation claim. The Chancery Court for Polk County ("the Trial Court") granted summary judgment to Defendant. Plaintiff appeals. We find and hold that there is no genuine disputed issue of material fact with regard to the fact that due to her medical restrictions Plaintiff is unable to perform the essential job functions of a store manager. Given this, Defendant was entitled to summary judgment on both of Plaintiff's claims. We, therefore, affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which ANDY D. BENNETT and THOMAS R. FRIERSON, II, JJ., joined.

William J. Brown, Cleveland, Tennessee, for the appellant, Lequita Nix Hilliard.

Keith D. Frazier, Nashville, Tennessee, for the appellee, Dolgencorp, LLC.

# OPINION

## Background

Plaintiff began working for Defendant as a sales associate at one of Defendant's Dollar General stores in October of 2004. In October of 2007, Plaintiff was promoted to the position of store manager at the Dollar General Store in Benton, Tennessee.

In July of 2013, Plaintiff was injured while working when a box fell on her as she was unloading stock from a 'rolltainer.' Plaintiff was sent to a doctor and returned to work the next day with restrictions. In July of 2014, Plaintiff reached Maximum Medical Improvement ("MMI"). She was found to have a 2% permanent partial impairment to the body as a whole and was assigned lifting restrictions.

In January of 2015, Defendant asked Plaintiff to fill out an Accommodation Determination Process form answering questions about what she could and could not do with regard to the essential job functions of a store manager. Plaintiff answered that she could not perform the function of "[f]requent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds." Defendant then placed Plaintiff on leave and on Family Medical Leave Act status. In March of 2015, Plaintiff sought worker's compensation for her permanent partial impairment. Shortly thereafter, Defendant filed a Separation Notice with the Department of Labor and Workforce Development stating that Plaintiff had quit her job when she failed to return to work from leave.

Plaintiff then sued Defendant alleging discrimination in violation of the Tennessee Disability Act and the Tennessee Human Rights Act and for retaliatory discharge for filing a worker's compensation claim. Defendant filed a motion for summary judgment supported by, among other things, deposition testimony of Plaintiff, Plaintiff's regional manager, and various other of Defendant's employees; Plaintiff's answers to Defendant's requests for admissions; and Plaintiff's responses to Defendant's statement of undisputed material facts.

One of the items submitted by Defendant in support of its motion for summary judgment was a document titled Physical Requirements To Work in a Store ("Physical Requirements"). When Plaintiff began employment with Defendant in 2004, Plaintiff signed the Physical Requirements attesting that she understood the physical requirements and could "perform all essential job functions listed above with or without a reasonable accommodation." The Physical Requirements included, in pertinent part:

4. Frequent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds.

2

Defendant also submitted the Accommodation Determination Process Form ("ADP Form") completed by Plaintiff after she was injured, which asked whether Plaintiff could complete specific job duties including: "4. Frequent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds." On the ADP Form in answer to this question, "No" was circled and handwritten in were the words "someone to help lift when handling merchandise."

Defendant also submitted Plaintiff's answers to Defendant's requests for admissions wherein Plaintiff admitted, among other things:

2. Dollar General Stores are operated with limited staffing, often having only one Sales Associate and one key holder/manager in the store.
RESPONSE: Admitted.
3. There are times when a Store Manager will work in the store alone.
RESPONSE: Admitted.
4. A Store Manager at a Dollar General Store is expected as part of his or her job duties to stock merchandise.
RESPONSE: Admitted.
5. A Store Manager is expected as part of his or her duties to assist customers.
RESPONSE: Admitted.
6. A Store Manager's assistance of customers can include lifting products into a cart or onto the counter for checkout.
RESPONSE: Admitted.
7. After reaching Maximum Medical Improvement Plaintiff was limited to working in the Medium DOT category except for overhead lifting where she is limited to light.
RESPONSE: Admitted.
8. Pursuant to the functional capacity exam that was performed by Johnny Case on or about July 15, 2014, Plaintiff was limited in floor to waist lifting to 30 pounds occasional and 23 pounds frequent.
RESPONSE: Admitted.
9. Pursuant to the functional capacity exam that was performed by Johnny Case on or about July 15, 2014, Plaintiff was limited in waist to shoulder lifting to 25 pounds occasional and 19 pounds frequent.
RESPONSE: Admitted.
10. Pursuant to the functional capacity exam that was performed by Johnny Case on or about July 15, 2014, Plaintiff was limited in waist to overhead lifting to 15 pounds occasional and 11 pounds frequent.
RESPONSE: Admitted.

* * *

13. The Dollar General Store managed by Plaintiff had products that weighed more than 23 pounds.
RESPONSE: Admitted.
14. The Dollar General Store managed by Plaintiff had products that weighed more than 19 pounds.
RESPONSE: Admitted.
15. The Dollar General Store managed by Plaintiff had products that weighed more than 11 pounds.
RESPONSE: Admitted.
16. The Dollar General Store managed by Plaintiff had cases of products such as bleach and laundry detergent that weighed more than 40 pounds.
RESPONSE: Admitted.
17. Plaintiff was allowed to work light duty between the time of her injury at Dollar General and being placed on a medical leave of absence.
RESPONSE: Admitted.
18. Between the time of Plaintiff's injury and being placed on medical leave her store was given a light duty labor credit for labor budget purposes of approximately $240 per week.
RESPONSE: Admitted.
19. The purpose of the light duty labor credit is to allow the store to schedule other employees for additional hours in recognition of the fact that Plaintiff had temporary medical restrictions that limited her lifting ability.
RESPONSE: Admitted.

Plaintiff testified during her deposition that a rolltainer is "basically a cage with wheels on it that the merchandise comes in on." Rolltainers are solid part of the way up and then covered with netting. Plaintiff stated that a rolltainer could be stacked with merchandise "almost to the top or it could be a couple of foot over the top." Plaintiff is five foot two inches tall, and she admitted that the merchandise would be over her head if it were stacked almost to the top in the rolltainer. Defendant provided a yellow safety stool for employees to stand on to unload merchandise.

Plaintiff testified that she worked a smaller store and that on average the store would get fifteen rolltainers in a shipment. The truck carrying the rolltainers would come on Fridays. Plaintiff testified that they were expected to "have the truck out on T1, which is the day after the truck comes."

Plaintiff generally worked two nights a week and four days. When she worked days, Plaintiff generally opened the store. On days when Plaintiff opened the store, she was there around seven a.m. and would be the only employee until "anywhere from ten to one o'clock." During certain seasons products would be put out on the front sidewalk for display. If Plaintiff opened the store, it was her responsibility to put those products out on display.

Defendant submitted the deposition testimony of Michael D'Andrea, the district manager in charge of Plaintiff's store during the relevant time period. Mr. D'Andrea testified that Plaintiff could not perform essential functions of her position as a store manager. He stated: "As part of the job duties, the physical requirements require - - . . . frequent and proper lifting of up to 40 pounds and occasional lifting up to 55. She was unable to perform that." Mr. D'Andrea was asked how he knew this, and he stated: "Based on the accommodation determination process that we went through."

Mr. D'Andrea stated there was no problem with Plaintiff managing her store after she was injured "[a]s long as she had the payroll credit . . . ." He explained that the payroll credit "allowed [Plaintiff] to run the store the way it was being run with her restrictions." Mr. D'Andrea testified that Plaintiff had told him that she brought more employees in to do the lifting because she could not. Mr. D'Andrea stated that Plaintiff "was unable to work by herself because if there was lifting required she would be unable to do it."

Mr. D'Andrea did not know if Plaintiff worked the store alone during the time period from July of 2013 through July of 2014. He was asked if it were shown that she had worked alone during that time period would the issue of her working alone be rendered immaterial to the determination of whether she could perform essential job functions, and he stated:

> That's incorrect. . . . Because a day in the life of a Dollar General store manager is never two of the same days. We don't have the same customers, we don't sell the same products at the same time the same days every month. One morning we may not lift anything and the next morning we may be asked to lift ten things. There's no way of knowing.

Jennifer Watson, the regional manager for Defendant, also was deposed. Ms. Watson testified that if an employee stated that they had permanent restrictions then Defendant would begin an accommodation determination process wherein the district manager would collect information from the employee about what they could and could not do based upon their restrictions. Ms. Watson explained that the accommodation determination process is based upon the employee's job description. Ms. Watson was

asked about her understanding of the accommodation determination process, and she stated: "When an employee comes forward with permanent restrictions, we decide whether we can accommodate those or not, based on their job position."

Ms. Watson testified that if the restrictions do not align with the job description, Defendant cannot accommodate the employee. She stated: "if your restrictions do not allow you to do the job as it's laid out, we cannot allow you to work." Ms. Watson was asked if there were any accommodations, and she stated: "There are reasonable accommodations. These [referring to Plaintiff's restrictions], as we see, with having the lifting restrictions from feet to knees, knees to waist, and overhead lifting, is not a reasonable accommodation." Ms. Watson stated: "due to the fact that she could not lift the required amount, it is not a reasonable accommodation to have someone lift all merchandise for her . . . well, anything over the lifting restrictions that were set forth." Ms. Watson stated: "having someone else lift the merchandise is not a reasonable accommodation. Her lifting restrictions from floor to knee, knee to waist, and overhead lifting are not something that we can accommodate based on the job description."

Ms. Watson further explained:

> For our lean staffing model, there is a lot of single coverage in the store, which means that the store manager is more likely than not in the building alone. So if a customer comes in and asks for help with merchandise that is over her lifting restriction and she cannot lift, we do not believe that - - she is not able to do that job. . . . [I]f a customer comes in and says, "I need help taking this dog food into my cart, putting the dog food on the shelf - - on the checkout, putting the dog food back in my cart and taking it out to my car," if it is above her lifting restriction and she's in the store alone - - the way she wanted someone to help is someone to help lift it. Well, if the customer cannot and she cannot, I don't know how else we would accomplish that. . . . [S]he had a lifting restriction from knee to waist. So it doesn't matter where the dog food was, shelf or above or floor, based on her restrictions from floor to knee, knee to waist, and overhead, she could not have lifted that dog food in any capacity.

Ms. Watson testified that during the year that Plaintiff worked with those restrictions "[s]he was receiving light duty accommodations. But all the more reason to do [the accommodation determination] process. We don't want her performing job duties that are outside of her lifting restrictions." Ms. Watson testified that when Plaintiff was placed on leave, the payroll credits were about to end.

6

Ms. Watson testified that leave is provided as an option if Defendant cannot accommodate restrictions. This option allows Defendant to hold the employee's job open during the leave period in the event that the restrictions change and the employee is able to return to work.

In support of its motion for summary judgment, Defendant also submitted Plaintiff's response to Defendant's statement of undisputed material facts, which provided, in pertinent part:

4. Each month, the District Manager who supervised the Benton Store provided Plaintiff with a "labor budget," which provided Plaintiff with the weekly amount of money that she could use to pay employees to staff the Benton Store.
Response: Admitted.
5. Dollar General Stores are operated with limited staffing, often only having one Sales Associate and one key holder/manager in the store.
Response: Admitted.
6. At times, the Store Manager will work in a Dollar General Store alone.
Response: Admitted.
7. At the end of Plaintiff's employment, the Benton Store's hours were 8:00 a.m. to 10:00 p.m., seven days a week.
Response: Admitted.
8. As Store Manager, Plaintiff generally worked four days and two nights per week.
Response: Admitted.
9. On the four weekdays that Plaintiff worked, she typically opened the store and arrived for work at 7:00 a.m.
Response: Admitted.
10. On the days that Plaintiff opened the store, Plaintiff typically was the only employee working store [sic] until as early as 10:00 a.m. or as late as 1:00 p.m., when the next employee would arrive for their shift.
Response: Admitted.

## Plaintiff's Job Responsibilities and Duties as Store Manager

11. The Store Manager in a Dollar General Store serves in a working position.
Response: Admitted.
12. The Store Manager in a Dollar General Store is expected as part of his or her job duties to stock merchandise.
Response: Admitted.

7

13. The Store Manager is also expected as part of his or her job duties to assist customers.

Response: Admitted.

14. The Store Manager's assistance of customers can include lifting products into a cart or onto the counter for checkout.

Response: Admitted.

15. When Plaintiff worked the Benton Store by herself, it was Plaintiff[']s job to assist in lifting merchandise into a customer's shopping cart if the customer was physically unable to lift the merchandise. This lifting requirement can include packages of dog food that weighs [sic] 30 pounds.

Response: It is admitted that Plaintiff[']s job included assisting customers with merchandise. It is also admitted that some of the bags of dog food weighed 30 pounds.

16. The "Working Conditions and Physical Requirements" section of the Store Manager job description includes "[f]requent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds."

Response: Admitted.

17. On October 14, 2004 (prior to Plaintiff's first day of work with Dollar General), Plaintiff was asked to review a "Physical Requirements To Work in a Store" form, which instructed as follows:

> Please review the following list of physical requirements necessary to work in a position at a Dollar General Store and indicate below whether you are able to perform these essential job functions with or without a reasonable accommodation.
>
> * * *
>
> 4. Frequent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds

Response: Admitted.

18. Plaintiff signed and dated the "Physical Requirements to Work in a Store" form certifying that she had "read and understood Dollar General's physical requirements necessary to work in a position at a Dollar General store" and "agree[d] that [she] can perform all essential job functions listed above with or without a reasonable accommodation."

Response: Admitted.

**Plaintiff's Workplace Injury and Workers' Compensation Claim**

8

19. On July 12, 2013, Plaintiff was injured at work in the Benton Store while unloading and stocking merchandise from a "rolltainer."
Response: Admitted.

\* \* \*

22. Dollar General allows employees who sustain on-the-job injuries to perform modified or light-duty work until they are cleared to work or they receive permanent medical restrictions upon reaching "maximum medical improvement."
Response: Admitted.

23. Plaintiff[']s treating doctor placed her arm in a sling for two weeks after her accident, and then placed Plaintiff on temporary work restrictions of no lifting more than 25 pounds.
Response: Admitted.

24. Plaintiff was allowed to work light duty between the time of her injury at Dollar General and being placed on a medical leave of absence.
Response: Admitted.

25. While an employee is assigned to perform modified or light-duty work, Dollar General provides the store with a "light duty labor credit," which adds money to the store's labor budget.
Response: Admitted.

26. Between the time of Plaintiff's injury and being placed on medical leave her store was given a light duty labor credit for labor budget purposes of approximately $240 per week.
Response: Admitted.

27. The purpose of the light duty labor credit is to allow the store to schedule other employees for additional hours in recognition of the fact that Plaintiff had temporary medical restrictions that limited her lifting ability.
Response: Admitted.

28. The $240 light duty labor credit allotted Plaintiff approximately 30 additional hours per week that she could schedule other employees to work.
Response: Admitted.

**Plaintiff Receives Permanent Restrictions**

29. In July 2014, Plaintiff was placed at Maximum Medical Improvement ("MMI") with respect to her work injury.
Response: Admitted.

30. On or about July 15, 2014, Plaintiff underwent a Functional Capacity Evaluation by Johnny Case, PT.

Response: Admitted.

31. Pursuant to the Functional Capacity Evaluation, Plaintiff was limited in floor to waist lifting to 30 pounds occasional and 23 pounds frequent.

Response: Admitted.

32. The Dollar General Store managed by Plaintiff had products that weighed more than 23 pounds.

Response: Admitted.

33. Pursuant to the Functional Capacity Evaluation, Plaintiff was limited in waist to shoulder lifting to 25 pounds occasional and 19 pounds frequent.

Response: Admitted.

34. The Dollar General Store managed by Plaintiff had products that weighed more than 19 pounds.

Response: Admitted.

35. Pursuant to the Functional Capacity Evaluation, Plaintiff was limited in waist to overhead lifting to 15 pounds occasional and 11 pounds frequent.

Response: Admitted.

36. The Dollar General Store managed by Plaintiff had products that weighed more than 11 pounds.

Response: Admitted.

\* \* \*

41. On January 2, 2015, District Manager Mike D'Andrea met with Plaintiff in the Benton Store and presented Plaintiff with an Accommodation Determination Process Form to complete.

Response: Admitted.

42. Plaintiff completed the Accommodation Determination Process form on January 2, 2015, and both she and Mike D'Andrea signed and dated the form.

Response: Admitted.

\* \* \*

49. Mr. D'Andrea also advised Plaintiff that the $240 weekly light duty labor credit that had been provided to the store would be ending.

Response: Admitted

(citations omitted).

After a hearing on the motion for summary judgment, the Trial Court entered its order on May 25, 2017 granting partial summary judgment after finding and holding, *inter alia*:

Plaintiff began working for Defendant in 2004. In October 2007, she was promoted to the position of store manager at the Dollar General store in Benton, Tennessee. With the Dollar General's limited staffing model, the store manager would be required, at times, to be in the store alone for some periods of time. To the extent customers needed assistance in lifting items that exceeded Plaintiff's lifting restrictions; she would be required to either refuse to assist the customer or to violate her restrictions. As part of her job duties as store manager, Plaintiff was expected to stock merchandise in addition to her management responsibilities. She was also expected to assist customers as needed. On October 14, 2004, when Plaintiff first began working for the Defendant she was asked to review and truthfully complete a "physical requirements to work in the store" form, which indicated that she could perform "frequent and proper lifting of up to 40 pounds; occasional lifting up to 55 pounds".

Defendant proffers a written job description signed by the Plaintiff when she was hired in October 2004. The job description contained certain lifting requirements. Plaintiff denies that the *actual* lifting requirements at the Dollar General store in Benton, Tennessee are the same as the written lifting requirements that she signed in 2004.

On July 12, 2013, Plaintiff was injured at the store, while unloading and stocking merchandise from a rolltainer. In July 2014, Plaintiff's treating physician placed her at maximum medical improvement. On or about July 15, 2014, Plaintiff underwent a functional capacity evaluation with Johnny Case, Physical Therapist. Based upon this evaluation, Plaintiff was limited in floor to waist lifting to 30 pounds occasionally and 23 pounds frequently. Plaintiff was limited in waist to shoulder lifting to 25 pounds occasionally and 19 pounds frequently. Lastly, Plaintiff was limited in waist to overhead lifting to 15 pounds occasionally and 11 pounds frequently.

Additionally, the working conditions and written physical requirements of a store manager contained the same lifting requirement. It is Plaintiff's position that regardless of the limitations placed on her by the functional capacity evaluation, she feels she could still perform the essential job functions of her job. However, the Defendant feels bound by

the medical professional who has opined otherwise; therefore, Plaintiff can no longer work for the Defendant. The Defendant had placed Plaintiff on medical leave because it could not accommodate her permanent restrictions. Once the medical leave of absence expired, Defendant sent Plaintiff a separation notice, communicating her employment separation effective March 16, 2015.

Plaintiff was a store manager and at times was the only person working; therefore, it was necessary for her to perform the essential job functions of a sales associate. Plaintiff's medical restrictions prohibited her from performing the company's written lifting requirements. Plaintiff admits she was told that she was placed on medical leave because Dollar General could not accommodate her permanent restrictions. However, Plaintiff denies this was the actual reason. She asserts in her response to the motion for summary judgment, that this reason was pretext for discrimination. She admits that on March 19, 2015 Dollar General sent her a separation notice communicating her employment separation effective March 16, 2015. However, that notice contained the word "quit" which Plaintiff denies. The balance of the request to admit filed by the Defendant was admitted.

\* \* \*

It is well settled that the *Tennessee Human Rights Act* (THRA) does not provide a remedy for discrimination on the basis of disability[.] *Barnes v. Goodyear Tire & Rubber Company*, 48 SW3d 968, 705 (Tenn. 2000). Therefore, this court holds Plaintiff[']s complaint fails as a matter of law to the extent Plaintiff is relying on the *Tennessee Human Rights Act*.

*The Tennessee Disability Act* (TDA) works in conjunction with the THRA to grant an individual a civil cause of action for wrongful discrimination based upon a disability. With regard to the *Tennessee Disability Act*, T.C.A. §8-50-103, the statute prohibits discrimination based solely upon physical, mental or visual disability of the "employee" unless such disability, to some degree, prevents the employee from performing the duties required by the employment sought or impairs the performance of the work involved. Under the TDA, there is no obligation on an employer to provide an employee with reasonable accommodation, *Jones v. Sharp Elecs. Corp.*, 2014 WL 806131 at 4 (Tenn. Ct. App. Feb. 28, 2014). Defendant in this case has shown that Plaintiff's injury prevents her from performing all of the job duties necessary of her position. Under *Workman*

12

*v. Frito Lay, Inc.*, 165 F. 3d 460, 468 (6th Circ. 1999), a determination that accommodation is required for the employee to perform the functions of the job ends the inquiry under Tennessee Law. Therefore, the Defendant in this case is entitled to summary judgment on the claims of the Plaintiff that the employer violated the *Tennessee Disability Act*.

The Trial Court, however, found that there were genuine disputed issues with regard to Plaintiff's claim for retaliatory discharge for filing a worker's compensation claim and allowed this claim to continue.

Defendant then filed a renewed motion for summary judgment as to Plaintiff's retaliatory discharge claim. After a hearing, the Trial Court entered its order on February 15, 2018 finding and holding:

> On May 25, 2017, this Court granted partial summary judgment for Defendant and dismissed Plaintiff's claim for disability discrimination under the Tennessee Disability Act and the Tennessee Human Rights Act. In its Order, the Court held that Plaintiff's disability discrimination claim failed because "Defendant in this case has shown that Plaintiff's injury prevents her from performing all of the job duties necessary of her position." May 25, 2017 Order, p. 4. Based on the Court's holding, Plaintiff and Defendant now agree that Plaintiff's claim for retaliatory discharge for making a workers' compensation claim also fails as a matter of law if she was physically unable to perform her job with Defendant. *See Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn. 1993).

> Having heard argument from the parties and further considered this issue, the Court finds that even if Plaintiff was able to present a *prima facie* case of retaliation, Plaintiff would be unable to overcome the Court's factual finding that she was physically unable to perform the functions of her job.. [sic] The Court grants Defendant's renewed motion for summary judgment and dismisses Plaintiff's workers' compensation retaliatory discharge claim.

Plaintiff appeals to this Court.

## Discussion

Although not stated exactly as such, Plaintiff raises two issues on appeal: 1) whether the Trial Court erred in granting summary judgment on her claim for disability discrimination under the Tennessee Disability Act and the Tennessee Human Rights Act;

13

and, 2) whether the Trial Court erred in granting summary judgment on her claim for retaliatory discharge for filing a worker's compensation claim.

As our Supreme Court has instructed:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (citing *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)).

* * *

> [I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id*. When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a

genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye v. Women's Care Cntr. of Memphis, MPLLC*, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015).

We first consider whether the Trial Court erred in granting summary judgment on Plaintiff's claim for disability discrimination under the Tennessee Disability Act and the Tennessee Human Rights Act. As pertinent to this issue, Tenn. Code Ann. § 8-50-103 of the Tennessee Disability Act provides:

> **8-50-103. Employment of the disabled – Discrimination prohibited – Penalty – Complaint.**
> (a) This section and § 8-50-104 shall be known and may be cited as the "Tennessee Disability Act."
> (b) There shall be no discrimination in the hiring, firing and other terms and conditions of employment of the state of Tennessee or any department, agency, institution or political subdivision of the state, or of any private employer, against any applicant for employment based solely upon any physical, mental or visual disability of the applicant, unless such disability to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved. Furthermore, no blind person shall be discriminated against in any such employment practices because such person uses a guide dog. A violation of this subsection (b) is a Class C misdemeanor.

\* \* \*

15

(d) For purposes of this section, "employer" means the state, or any political or civil subdivision thereof, and persons employing eight (8) or more persons within the state.

Tenn. Code Ann. § 8-50-103 (2016). Also as pertinent, Tenn. Code Ann. § 4-21-311 of the Tennessee Human Rights Act provides:

(e) In any civil cause of action alleging a violation of this chapter or of § 8-50-103, the plaintiff shall have the burden of establishing a prima facie case of intentional discrimination or retaliation. If the plaintiff satisfies this burden, the burden shall then be on the defendant to produce evidence that one (1) or more legitimate, nondiscriminatory reasons existed for the challenged employment action. The burden on the defendant is one of production and not persuasion. If the defendant produces such evidence, the presumption of discrimination or retaliation raised by the plaintiff's prima facie case is rebutted, and the burden shifts to the plaintiff to demonstrate that the reason given by the defendant was not the true reason for the challenged employment action and that the stated reason was a pretext for illegal discrimination or retaliation. The foregoing allocations of burdens of proof shall apply at all stages of the proceedings, including motions for summary judgment. The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of intentional discrimination or retaliation.

Tenn. Code Ann. § 4-21-311(e) (2015).

This Court has discussed disability discrimination claims stating:

The Tennessee Disability Act ("TDA") prohibits private employers from discriminating against employees "based solely upon any physical, mental or visual disability of the applicant, unless such disability to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved." Tenn. Code Ann. § 8–50–103(b). The TDA embodies the rights and definitions of the THRA. *Barnes v. Goodyear Tire and Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000). Accordingly, there are three elements to a claim for discrimination under the TDA; a claimant must show: "(1) that the individual was qualified for the position; (2) that the individual was disabled; and (3) that the individual suffered an adverse employment action because of that disability." *Barnes*, 48 S.W.3d at 705. The third element,

16

or causation element, may be established by either direct or indirect evidence of discrimination. *Id*. at 710. The threshold issue, however, is whether the claimant is "disabled." *Barnes*, 48 S.W.3d at 709–710; *Cecil v. Gibson*, 820 S.W.2d 361, 365 (Tenn. Ct. App. 1991).

When interpreting Tennessee's anti-discrimination laws, such as the TDA and the THRA, the Tennessee Supreme Court has stated that the courts are "neither bound by nor restricted by the federal law," however, the Court also noted that the legislature's stated purpose in codifying the THRA "was to prohibit discrimination in a manner consistent with 'the federal Civil Rights Act of 1964, 1968, and 1972,' " and, as such, courts "may look to federal law for guidance in enforcing our own anti-discrimination laws." *Barnes*, 48 S.W.3d at 705; *see* Tenn. Code Ann. § 4–21–101(a)(1) and (2); *Forbes v. Wilson Cty. Emergency*, 966 S.W.2d 417, 420 (Tenn. 1998); *see also Sasser v. Quebecor Printing (USA) Corp.*, 159 S.W.3d 579 (Tenn. Ct. App. 2004); *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539 (6th Cir. 2008) *rehearing and rehearing en banc denied* (Aug. 14, 2008). In fact, the TDA elements are very similar to those of the ADA, but do not include a "reasonable accommodation" component. *Roberson v. Cendant Travel Services, Inc.*, 252 F.Supp.2d 573, 583 (M.D. Tenn. 2002).

*Bennett v. Nissan North America, Inc.*, 315 S.W.3d 832, 841-42 (Tenn. Ct. App. 2009) (footnote omitted). With regard to the first element regarding whether the "the individual was qualified for the position," the *Bennett* Court explained:

Under the TDA, an employer will not be considered to have unlawfully discriminated against an individual with a disability if the individual's disability "to some degree prevents the applicant from performing the duties required by the employment sought or impairs the performance of the work involved." Tenn. Code Ann. § 8–50–103(b). The Tennessee Supreme Court has interpreted this language to require a claimant under the TDA to show that he or she "was qualified for the position" in addition to the two other elements -- that he or she is "disabled" and suffered an adverse employment action. *Barnes*, 48 S.W.3d at 705. The *Barnes* court explained that "[a]n individual may be deemed qualified if the individual can perform, with or without reasonable accommodation, the essential functions of the employment position in question." *Id*. (*citing* 42 U.S.C. § 12111(8); *Southeastern Comm. College v. Davis*, 442 U.S. 397, 406, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)). The ADA also requires that an individual show that he or she was "qualified"

17

for the position that was sought or from which he or she was removed. 42 U.S.C. § 12111(8). Under the ADA, this inquiry has two prongs: the individual must (1) possess the requisite skill, education, experience, and training for the position; and (2) be able to perform the essential job functions, with or without reasonable accommodation. 42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m); *see also Burns*, 222 F.3d at 256.

\* \* \*

The THRA defines "discriminatory practices" as "any direct or indirect act or practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference in the treatment of a person or persons because of race, creed, color, religion, sex, age or national origin." Tenn. Code Ann. § 4–21–102(4). The ADA is more specific, defining the term "discriminate against a qualified individual on the basis of disability" as "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C.A. § 12112(b)(6). Therefore, while the ADA prohibits employers from using "qualification standards" as a tool to block a disabled person from advancing in the workplace, the ADA expressly permits an employer to apply "qualification standards" that deny a job to an individual with a disability as long as those standards are "job-related" and "consistent with business necessity." 42 U.S.C. §§ 12112(b)(6) and 12113(a) (2008); 29 C.F.R. § 1630.15(b)(1).

*Id*. at 852-54. "Unlike its federal counterpart, the Americans with Disabilities Act ("ADA"), the TDA, [Tennessee Disability Act] does not impose a duty on employers to make reasonable accommodations to accommodate a disabled employee." *Jones v. Sharp Elecs. Corp.*, No. W2013-01817-COA-R3-CV, 2014 WL 806131, at \*3 (Tenn. Ct. App. Feb. 28, 2014), *Rule 11 appl. perm. appeal denied Aug. 27, 2014*.

We first consider whether Plaintiff is qualified for the job of store manager. We must consider whether Plaintiff's medical restrictions prevent Plaintiff to some degree from performing the essential duties required of a store manager. Pursuant to the Tennessee Human Rights Act, even at the summary judgment stage, Plaintiff carried the "burden of establishing a prima facie case of intentional discrimination or retaliation." Tenn. Code Ann. § 4-21-311(e) (2015).

18

With regard to the essential functions of a job as a store manager, Plaintiff admitted that "[t]he 'Working Conditions and Physical Requirements' section of the Store Manager job description includes '[f]requent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds.' " Plaintiff also admitted that it was part of a store manager's job to stock merchandise and to assist customers and that such assistance could include lifting products into a cart or on to the counter for check out. Plaintiff further testified that the rolltainers upon which products are shipped to the store can be stocked "almost to the top or it could be a couple of foot over the top." Those rolltainers must be unloaded so product can be put out in the store for sale. Plaintiff admitted that she is five foot two, and the merchandise in the rolltainer would be over her head if stacked almost to the top. Furthermore, Plaintiff admitted that Defendant operates using a limited staffing model wherein the store manager works the store alone for hours at a time on a regular basis.

With regard to performing the essential functions of the store manager job, Plaintiff admitted in her response to Defendant's request for admissions:

> 7. After reaching Maximum Medical Improvement Plaintiff was limited to working in the Medium DOT category except for overhead lifting where she is limited to light.
> RESPONSE: Admitted.
> 8. Pursuant to the functional capacity exam that was performed by Johnny Case on or about July 15, 2014, Plaintiff was limited in floor to waist lifting to 30 pounds occasional and 23 pounds frequent.
> RESPONSE: Admitted.
> 9. Pursuant to the functional capacity exam that was performed by Johnny Case on or about July 15, 2014, Plaintiff was limited in waist to shoulder lifting to 25 pounds occasional and 19 pounds frequent.
> RESPONSE: Admitted.
> 10. Pursuant to the functional capacity exam that was performed by Johnny Case on or about July 15, 2014, Plaintiff was limited in waist to overhead lifting to 15 pounds occasional and 11 pounds frequent.
> RESPONSE: Admitted.

Plaintiff admitted in her response to Defendant's statement of undisputed material facts:

> 32. The Dollar General Store managed by Plaintiff had products that weighed more than 23 pounds.
> Response: Admitted.

* * *

19

34. The Dollar General Store managed by Plaintiff had products that weighed more than 19 pounds.
Response: Admitted.

* * *

36. The Dollar General Store managed by Plaintiff had products that weighed more than 11 pounds.
Response: Admitted.

Furthermore, Plaintiff also admitted, in her response to Defendant's statement of undisputed material facts:

15. When Plaintiff worked the Benton Store by herself, it was Plaintiff[']s job to assist in lifting merchandise into a customer's shopping cart if the customer was physically unable to lift the merchandise. This lifting requirement can include packages of dog food that weighs [sic] 30 pounds. Response: It is admitted that Plaintiff[']s job included assisting customers with merchandise. It is also admitted that some of the bags of dog food weighed 30 pounds.

During the accommodation determination process, Plaintiff completed an ADP Form, which asked if Plaintiff was able to perform: "4. Frequent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds," and Plaintiff answered "No" to this question. On the ADP Form after the answer "No" to this question, "someone to help lift when handling merchandise" was handwritten on the form. Thus, Plaintiff admitted that she cannot perform the essential job function of "4. Frequent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds."

In her brief on appeal, Plaintiff argues, in essence, that "[f]requent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds" cannot be considered an essential job function of her job as a store manager for Defendant. Plaintiff argues that she "always did her job, both before and after her worker[']s compensation injury." She states, in her brief on appeal, that "the standard required by the Tennessee Disability Act is that the employee must be able to perform the 'essential job functions', not all the conceivable circumstances that an employer might conceive would confront her when performing her job."

As noted above, we "may look to federal law for guidance in enforcing our own anti-discrimination laws." *Bennett*, 315 S.W.3d at 841 (quoting *Barnes v. Goodyear Tire*

*and Rubber Co.*, 48 S.W.3d 698, 705 (Tenn. 2000)). The Sixth Circuit has offered guidance on the issue of determining whether a job function is essential stating:

> "The term *essential functions* means the fundamental job duties of the employment position the individual with a disability holds or desires," but it does not include only marginal functions. 29 C.F.R. § 1630.2(n)(1). In determining whether a particular function is essential, the regulations instruct courts to consider the following list of factors, which is illustrative rather than exhaustive:
>
> > (i) The employer's judgment as to which functions are essential;
> > (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
> > (iii) The amount of time spent on the job performing the function;
> > (iv) The consequences of not requiring the incumbent to perform the function;
> > (v) The terms of a collective bargaining agreement;
> > (vi) The work experience of past incumbents in the job; and/or
> > (vii) The current work experience of incumbents in similar jobs.
>
> 29 C.F.R. § 1630.2(n)(3). The inquiry into whether a function is essential is highly fact specific. *See Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998); *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988) ("Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved.").

*Hoskins v. Oakland Cty. Sheriff's Dept.*, 227 F.3d 719, 726 (6th Cir. 2000).

Plaintiff admitted that stocking merchandise and assisting customers are essential functions of the job of a store manager. She further admitted that the Dollar General store contains cases of products such as bleach and laundry detergent that weigh more than 40 pounds. Plaintiff also admitted that the store carried dog food in 30 pound bags. Most importantly, Plaintiff admitted that a store manager is expected to assist customers and that such assistance can include lifting products into a cart or on to the counter for checkout. Mr. D'Andrea testified that:

21

[A] day in the life of a Dollar General store manager is never two of the same days. We don't have the same customers, we don't sell the same products at the same time the same days every month. One morning we may not lift anything and the next morning we may be asked to lift ten things.

Defendant believes "[f]requent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds" to be an essential function of a store manager as shown by the fact that Defendant had Plaintiff sign the Physical Requirements attesting to her ability to perform these functions prior to beginning work with Defendant. Further, Defendant had provided the light duty labor credit for a period of time to enable Plaintiff to schedule other employees to work an additional 30 hours per week because of, and to cover, Plaintiff's restricted lifting ability. This is further proof that the lifting of merchandise was an essential function of Plaintiff's job as a store manager. Plaintiff admitted that two of her main tasks as a store manager include stocking merchandise, which includes lifting products, and assisting customers, which can include lifting products for customers. Furthermore, Defendant has shown that the store operates with limited staffing requiring the store manager frequently to work the store alone. If Plaintiff were working the store alone, as is customary, and a customer were to need assistance lifting products that exceeded the weight limit imposed by Plaintiff's restrictions, Plaintiff would need either to refuse to assist the customer or violate her restrictions. A possible outcome could be loss of a customer. Another possible outcome could be Plaintiff violating her restrictions and injuring herself as a result. Defendant has shown that just because Plaintiff has not been asked to lift products outside of her restricted weight limit lately does not mean that she would not be asked to do so the next time she worked, as Mr. D'Andrea testified that every day as a store manager is different.

Plaintiff admitted that she cannot perform the essential job function of "[f]requent and proper lifting of up to 40 pounds; occasional lifting of up to 55 pounds." As such, Plaintiff has failed to show that she is qualified for the position of store manager. We reiterate: "The plaintiff at all times retains the burden of persuading the trier of fact that the plaintiff has been the victim of intentional discrimination or retaliation." Tenn. Code Ann. § 4-21-311(e) (2015). As Plaintiff failed to carry her burden, the burden never shifted to Defendant, and Defendant was entitled to a grant of summary judgment on Plaintiff's claim for disability discrimination under the Tennessee Disability Act and the Tennessee Human Rights Act

We turn next to Plaintiff's issue regarding whether the Trial Court erred in granting summary judgment on her claim for retaliatory discharge for filing a worker's compensation claim. As this Court explained in *Reed v. Alamo-Rent-A-Car, Inc.*:

In order to establish a cause of action for discharge in retaliation for asserting a workers' compensation claim, a plaintiff must plead and prove the following elements:

> (1) The plaintiff was an employee of the defendant at the time of the injury;
> (2) the plaintiff made a claim against the defendant for workers' compensation benefits;
> (3) the defendant terminated the plaintiff's employment; and
> (4) the claim for workers' compensation benefits was a substantial factor in the [defendant's] motivation to terminate the [plaintiff's] employment.

*Anderson v. Standard Register Co.*, 857 S.W.2d 555, 558 (Tenn. 1993).

* * *

This court has held that, in order to establish the element of causation, the plaintiff must present some proof other than merely the facts showing her employment, her exercise of rights under the Workers' Compensation Law, and her subsequent discharge. *Thomason v. Better–Bilt Aluminum Prods., Inc.*, 831 S.W.2d 291, 293 (Tenn. App. 1992). The plaintiff may accomplish this goal either by presenting direct evidence of the necessary causal link or by introducing compelling circumstantial evidence of such a link. *Id.*

* * *

Moreover, a plaintiff may not prevail on a wrongful discharge claim merely by showing that a causal connection exists between her on-the-job injury and her subsequent discharge. *Vaughan v. Harvard Indus.*, 926 F.Supp. at 1351. Instead, the plaintiff must show that her claim for workers' compensation benefits, as opposed to her injury, was the true or substantial reason for her discharge. *Id.*; *see also Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn. 1993) (holding that plaintiff failed to establish causal relationship where she testified that she had "been out so long" that her employer "didn't have the time to wait"). And, absent evidence of a discriminatory motive, a plaintiff may not satisfy the causation requirement merely by showing that her employer required her to return to work over her objection that she was medically unable to work. *Harris v. American Red Cross*, 752 F.Supp. 737, 740 (W.D. Tex. 1990).

*Reed v. Alamo-Rent-A-Car, Inc.*, 4 S.W.3d 677, 684-85 (Tenn. Ct. App. 1999).

As discussed fully above, Plaintiff cannot perform the essential job functions of a store manager. As such, Plaintiff cannot prove the fourth element of her claim for retaliatory discharge for filing a worker's compensation claim, and her retaliatory discharge claim fails as a matter of law. Plaintiff admitted so in her response to Defendant's renewed motion for summary judgment. We find no error in the Trial Court's grant of summary judgment to Defendant on this claim.

### Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Lequita Nix Hilliard, and her surety.

_____
D. MICHAEL SWINEY, CHIEF JUDGE