IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 17, 2022 Session

## BARRY CHARLES BLACKBURN EX REL. BRITON B. v. MARK A. MCLEAN, M.D., ET AL.

**Appeal from the Circuit Court for Maury County**
No. 15513     Russell Parkes, Judge

———————————————————

**No. M2021-00417-COA-R3-CV**

———————————————————

This is a wrongful death health care liability action. At issue in this appeal are claims that were asserted against a hospital and an emergency room physician. During the course of litigation, the trial court permitted the defendants to amend their pleadings to assert a comparative fault defense but placed certain limitations on any new experts the plaintiff might retain to address the defense. The trial court also denied the plaintiff's efforts to secure a new standard of care expert when one of his retained experts withdrew from the case and refused to testify. Ultimately, through a series of summary judgment orders, the claims against the hospital and emergency room physician were dismissed. Although the plaintiff generically challenges the trial court's summary judgment dispositions on appeal, we conclude that the plaintiff's challenges are all waived except as they relate to the last summary judgment order that was entered as to the emergency room physician. That summary judgment order is reversed consistent with the discussion herein, namely in light of our conclusion that the trial court abused its discretion in refusing to allow the plaintiff to secure a substitute standard of care expert after his retained expert refused to testify due to no fault of counsel or his client. Further, although we find no error in the trial court's decision to allow the defendants to amend their pleadings to assert comparative fault, we are of the opinion that the court abused its discretion with respect to the limitations it placed on any potential expert retained by the plaintiff to address the issues raised in the later amendment alleging comparative fault.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed in part, Reversed in part, and Remanded**

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and CARMA DENNIS MCGEE, J., joined.

Joe Bednarz, Sr., Joe Bednarz, Jr., and Aaron Armstrong, Hendersonville, Tennessee, for the appellant, Barry Charles Blackburn ex rel. Briton B.

Marty R. Phillips, Michelle Greenway Sellers, and Brandon J. Stout, Jackson, Tennessee, for the appellee, Mark McLean.

Robert L. Trentham, Taylor B. Mayes, and James A. Beakes, III, Nashville, Tennessee, for the appellee, Maury Regional Hospital.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY**

This lawsuit concerns allegations of medical negligence connected to the death of Cody Blackburn ("the Decedent"). Much of the relevant background pertaining to the present appeal has been discussed in a prior appeal of this case, *see Blackburn ex rel. Briton B. v. McLean*, No. M2019-00428-COA-R3-CV, 2020 WL 4432038 (Tenn. Ct. App. July 31, 2020) ("*McLean I*"), but we restate herein many of the basic facts and events for purposes of clarity and context, while also covering the procedural events that took place following our decision in *McLean I*.

As alleged in the complaint filed by the Decedent's father as the next friend and grandfather of the Decedent's son ("the Plaintiff"), the Decedent, a 35-year-old male, was taken to Maury Regional Medical Center on the morning of September 17, 2014, following a 911 call. The Decedent presented with complaints of severe pain in his chest and abdomen and shortness of breath, and he was treated in the ER by Dr. Mark McLean ("Dr. McLean"). According to the complaint:

> 10. Serial EKGS were performed, the first at 9:59 a.m. (in the ambulance) was read at 10:23 a.m. and the second was performed at 10:25 a.m. and read at 10:28 a.m. These EKGS were read and noted to be abnormal.
>
> 11. Dr. McLean ordered lab workup and xrays and at approximately 12:07 p.m. Dr. McLean told the family that his labs were slightly elevated but his x-ray was normal and per the elevated d-dimer a CT of the abdomen and pelvis was ordered with contrast.
>
> 12. At approximately 2:15 p.m. Mr. Blackburn was taken down to radiology to perform the CT with contrast and he was brought back to his room at approximately 2:45 p.m.
>
> 13. At approximately 2:50 p.m. Mr. Blackburn stretched out his arms, screamed out in pain and collapsed, but despite resuscitation efforts he died.

The Plaintiff accused Dr. McLean and the hospital (collectively, "the Defendants") of

various acts of negligence, including alleging that Dr. Mclean had "[f]ail[ed] to order the appropriate tests in a timely manner." The Defendants each filed separate answers to the complaint in February 2016, and as acknowledged by the parties on appeal, the terms of an agreed scheduling order directed that motions to amend pleadings be filed by January 1, 2018. Trial was scheduled to begin at the end of April 2018.

During the pendency of the case, the parties disclosed various expert witnesses. As is of particular relevance to the issues posed in this appeal, the Plaintiff disclosed Dr. Richard Sobel ("Dr. Sobel"), who was to testify as a standard of care expert, and Dr. Keith Allen ("Dr. Allen"), who was to testify as to causation.

Dr. Sobel was deposed by the Defendants on October 4, 2017. Prior to his deposition, efforts had been made by the Defendants to subpoena Dr. Sobel's financial records reflecting the amount of income that he had derived from his previous work as an expert witness, but Dr. Sobel did not bring the requested documents to his deposition. Later, on February 1, 2018, Dr. McLean filed a motion to compel the Plaintiff and Dr. Sobel to produce copies of Dr. Sobel's tax records reflecting the amount of money he was paid for "medico-legal matters" during certain prior years.

Dr. Allen was deposed on September 21, 2017. During his discovery deposition, Dr. Allen testified that the Decedent "would probably be alive" when he was asked what would have happened had the Decedent "sought earlier treatment, and if that treatment were the same as what was provided when he did present." Subsequently, on January 2, 2018, Dr. McLean filed a motion to amend his answer to plead the comparative fault of the Decedent as a defense. The hospital later joined in Dr. McLean's motion.

A hearing on the above-mentioned motions to amend and to compel occurred on March 9, 2018, and in orders entered on March 28, 2018, the trial court held that both motions should be granted. In its order directing Dr. Sobel to produce the requested documents regarding his income from "medico-legal matters," the trial court held that Dr. Sobel's production would be "subject to a protective order which will be separately entered." Below, we briefly examine, by subject, several issues and events that subsequently occurred in the wake of the trial court's March 28, 2018, orders and prior to the appeal in *McLean I*. After outlining this history, we will then conclude our overview of the case's background by turning to the proceedings that occurred following our decision in *McLean I*.

*Production of Dr. Sobel's Financial Records and Dr. Sobel's Later Refusal to Testify*

It appears from the record that the Plaintiff's counsel produced copies of the documents pertaining to Dr. Sobel's income on April 9, 2018, and in a subsequent April 11, 2018, filing, Dr. McLean moved the trial court to "lift the Protective Order entered in

- 3 -

this matter regarding the documents ultimately produced by [Dr. Sobel]." The hospital later filed a notice of joinder with respect to this request. The trial court did, in fact, lift its protective order, ruling that Dr. Sobel should "not be afforded the luxury" of a protective order given inconsistencies the court had reviewed between his deposition testimony in this case and that from other cases, as well as a comparison of that testimony with the tax documents that he produced. The trial court additionally noted that "Dr. Sobel's income earned as an expert witness is already public knowledge by virtue of Dr. Sobel's prior testimony in open court."

Following the lifting of the protective order, Dr. Sobel refused to testify as an expert witness for the Plaintiff in this litigation, prompting a need for the Plaintiff to secure substitute expert testimony. In "Plaintiff's Motion to Substitute Expert Witness" filed on January 22, 2019, the Plaintiff attributed Dr. Sobel's withdrawal from the case to the sequence of events discussed above, stating as follows:

> Plaintiff would show that previous orders of the Court regarding the production of Dr. Sobel's tax returns put a great strain on the relationship between Plaintiff's counsel and Dr. Sobel that could not be overcome. This tension culminated on January 16, 2019 with Dr. Sobel withdrawing from the case and refusing to continue as Plaintiff's expert.

In an accompanying memorandum, the Plaintiff argued that other courts "have long recognized that substitution of an expert after the deadline for discovery has passed is proper when the prior expert becomes unavailable through no fault of that party." The Plaintiff further argued that it would be proper to allow him to replace Dr. Sobel with Dr. William Lunders ("Dr. Lunders"). The Plaintiff noted that "Dr. Lunders has similar training and expertise and his opinion[s] are similar to those of Dr. Sobel." In fact, the Plaintiff stated that Dr. Lunders' opinions were "for the most part identical" when compared to Dr. Sobel's opinions. In support of his request for relief, the Plaintiff included, among other things, a Rule 26 disclosure for Dr. Lunders, an affidavit from Dr. Lunders, and an affidavit from the Plaintiff's counsel. The trial court ultimately denied the Plaintiff's request for relief and held that he is "not permitted to supplement or substitute an expert for Dr. Sobel."

*Limitations Following Comparative Fault Amendments*

Amended answers alleging comparative fault by the Decedent were filed in April 2018, and in light of the amendments, the Plaintiff ultimately sought a continuance. The scheduled April 2018 trial date was subsequently stricken, and a status conference was instead held on April 30, 2018. In an order entered following the conference, the trial court noted in relevant part as follows:

> The Court finds that the Plaintiff's Motion for Continuance was granted after

Defendants' timely filed Motion to Amend to assert the fault of [the Decedent]. The Court finds that the Plaintiff's Motion for Continuance was granted to allow Plaintiff to obtain a cardiologist to respond to the Defendants' comparative fault allegation as to [the Decedent]. Plaintiff may take a supplemental deposition of Defendants['] experts relative to the comparative fault of [the Decedent] only. It is appropriate to amend the Scheduling Order to allow Plaintiff to retain expert(s) on the issue of comparative fault only. The Court finds that the Plaintiff may not identify or use any new expert witnesses to backdoor and address any issue other than the comparative fault of [the Decedent]. Any new expert identified by Plaintiff may be disclosed to address only the issue of [the Decedent's] comparative fault.

The Court finds that Plaintiff may not identify or use any new experts to address the standard of care for Defendants or alleged violations of the standard of care by Defendants. Plaintiff is not permitted to present any new experts to testify about the alleged fault of Defendant McLean and/or what he allegedly did wrong. Plaintiff is not permitted to present any new experts to testify as to the alleged fault of Maury Regional Medical Center. Plaintiff is not permitted to present any new experts to compare the fault of [the Decedent] to the fault of Defendants.

The Plaintiff opposed the court's stated limitations on new experts, arguing that the "decision to allow Plaintiff to get a new expert limited to saying that [the Decedent] is not at fault does nothing to relieve that prejudice Plaintiff is faced with as a result of the late amendment." The trial court, however, rejected the Plaintiff's concern and denied a motion the Plaintiff filed in an attempt to get the ruling amended.

*Summary Judgment Dispositions*

Throughout the course of the trial court proceedings, various summary judgment motions were filed and adjudicated. For instance, in March 2018, Dr. McLean sought summary judgment as to "seventeen standard of care opinions offered . . . by Dr. Sobel," arguing that there was "no causation expert support." The hospital joined in this motion, and the motion was eventually granted. In another filing—and in light of the fact that the above-mentioned motion by Dr. McLean did not address all standard of care criticisms against it—the hospital later moved to strike certain standard of care criticisms offered by Dr. Sobel and another of the Plaintiff's disclosed experts, Nurse Lori Jaggers Alexander. In an order entered on August 30, 2018, the trial court addressed this request from the hospital and held as follows:

3. By Order entered June 8, 2018, the Court granted Dr. McLean's and [the hospital's] Motion for Partial Summary Judgment dismissing 17 of Dr.

- 5 -

Sobel's standard of care criticisms that were not properly supported by expert proof of causation. The Court held that none of Dr. Sobel's 17 opinions referred to in the Defendants' Motion for Partial Summary Judgment could be introduced into evidence against either Defendant.

4. Therefore, the Court's Order of June 8, 2018, dismissed all of Dr. Sobel's 17 standard of care criticisms that were intended to be directed to [the hospital].

5. The issue of whether . . . Nurse Alexander's standard of care criticisms of [the hospital] were properly supported by expert proof of causation was not before the Court and was not the subject of the Court's Order of June 8, 2018. The Court will consider a properly supported Motion for Partial Summary Judgment regarding Nurse Alexander's standard of care criticisms of [the hospital] if such a motion is filed.

The hospital filed such a motion concerning Nurse Alexander's standard of care criticisms on November 19, 2018, and this motion was later granted. In granting the hospital summary judgment, the trial court held that there was "no competent expert proof to support any standard of care claims against [the hospital]." The court further attempted to certify the order as final pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure, and in a subsequent order, it held as follows:

The Order Granting [the hospital's] Motion for Summary Judgment was to be certified as a final order. In light of those rulings and the fact that Plaintiff has no expert witness to testify as to the standard of care of Defendant Mark A. McLean, M.D., the Court continued the trial and stayed the case. The Court finds that continuing the trial and staying the proceedings will allow Plaintiff to appeal the Court's ruling granting [the hospital's] Motion for Summary Judgment. The Court finds that if the Order Granting [the hospital's] Motion for Summary Judgment is upheld on appeal or if the Order Denying Plaintiff's Motion to Substitute Expert is upheld on appeal, then Plaintiff will have no expert proof as to the standard of care of Defendant McLean and the entire case will be dismissed.

Although a prior appeal was then pursued in this Court, as previously alluded to, we vacated the trial court's order certifying its judgment as final and remanded for further proceedings. *McLean I*, at *1.

*Filings and Proceedings Occurring After the Decision in McLean I*

Following this Court's action in *McLean I*, the Plaintiff again moved the trial court to allow him to bring in Dr. Lunders as an expert, while also requesting that the court alter

or amend its order granting summary judgment to the hospital. The trial court denied the Plaintiff any relief with respect to these requests. For his part, Dr. McLean sought summary judgment in light of Dr. Sobel's withdrawal from the case, arguing that "Plaintiff has no expert proof as to the recognized standard of acceptable professional practice required of Defendant or that the Defendant failed to act in accordance with the recognized standard of acceptable professional practice required of him in his care and treatment of [the Decedent]." Dr. McLean also proffered his own affidavit, wherein he declared under penalty of perjury that he had acted in accordance with the recognized standard of acceptable professional practice in his care of the Decedent.

Subsequent to the filing of this motion for summary judgment by Dr. McLean, the Plaintiff filed a response in opposition to the motion, while also filing a motion for leave to voluntarily dismiss his claims against Dr. McLean without prejudice. These motions were later dealt with by the trial court in a set of orders entered on February 9, 2021. In addition to ruling that the Plaintiff's motion for leave to voluntarily dismiss his claims against Dr. McLean should be denied, the trial court granted Dr. McLean summary judgment, finding there to be "no genuine issue as to the material fact of whether Dr. McLean complied with the recognized standard of acceptable professional practice." The Plaintiff thereafter filed a motion to alter or amend the trial court's orders concerning these issues on February 12, 2021, but the court denied this motion by a written order entered on March 29, 2021. This appeal followed.

## DISCUSSION

On appeal, the Plaintiff raises multiple issues for our review. In addition to challenging the trial court's decision to allow the Defendants to assert a comparative fault defense in amended pleadings and challenging the limitations imposed by the court following that decision, the Plaintiff takes issue with the court's refusal to allow him to replace Dr. Sobel as a witness, asserts error in the court's refusal to allow him to voluntarily dismiss his claims against Dr. McLean without prejudice, and raises the question of "[w]hether the trial court erred in granting numerous full and partial motions for summary judgment." For their part, neither Dr. McLean nor the hospital raises an independent issue alleging that any error was committed by the trial court. They instead generally request that this Court affirm the trial court's rulings, while also specifically submitting that the Plaintiff's raised issue connected to the various entries of summary judgment has been waived.

*Summary Judgment Orders*

We begin our review by focusing on the Plaintiff's raised issue concerning the entry of summary judgments in this case and the Defendants' arguments that this issue has been waived. In his brief, the Plaintiff's proffered "argument" concerning summary judgment paints with an extremely broad brush, generally attributing the entry of summary judgment

orders to "[t]he effect of the numerous erroneous decisions."  As best as we are able to discern, it appears that the Plaintiff's allusion to "numerous erroneous decisions" refers to the Plaintiff's other raised issues in the case, but the Plaintiff also states that "[n]umerous other errors contributed to the [summary judgment] rulings."  The contemplated "[n]umerous other errors" are not specified, and the Plaintiff's brief does not make any attempt at connecting these non-specified errors to any specific summary judgment ruling. The Plaintiff's entire argument consists of a single paragraph, contains no citation to authority or the record, and summarily states that "because of space constraints and the sheer number of errors which occurred Plaintiff cannot possibly brief this issue in detail." The Plaintiff concludes by stating, "The bottom line is that the motions for summary judgment could not have been granted but for the numerous errors already."

The Defendants generally submit that the above-described features of the Plaintiff's brief relative to this issue demonstrate noncompliance with the requirements that the Tennessee Rules of Appellate Procedure impose on appellate briefs.  Dr. McLean specifically contends that the Plaintiff has, at best, offered a "skeletal" argument.  We agree that the briefing submitted on this issue is deficient.  Pursuant to Rule 27 of the Tennessee Rules of Appellate Procedure, an appellant's brief "shall contain under appropriate headings" the following:

> (1) A table of contents, with references to the pages in the brief;
>
> (2) A table of authorities, including cases (alphabetically arranged), statutes and other authorities cited, with references to the pages in the brief where they are cited;
>
> (3) A jurisdictional statement in cases appealed to the Supreme Court directly from the trial court indicating briefly the jurisdictional grounds for the appeal to the Supreme Court;
>
> (4) A statement of the issues presented for review;
>
> (5) A statement of the case, indicating briefly the nature of the case, the course of proceedings, and its disposition in the court below;
>
> (6) A statement of facts, setting forth the facts relevant to the issues presented for review with appropriate references to the record;
>
> **(7) An argument, which may be preceded by a summary of argument, setting forth:**
>
> > **(A) the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why**

- 8 -

> **the contentions require appellate relief, with citations to the
> authorities and appropriate references to the record (which
> may be quoted verbatim) relied on; and**
>
> **(B) for each issue, a concise statement of the applicable standard of
> review (which may appear in the discussion of the issue or under a
> separate heading placed before the discussion of the issues);[1]**
>
> (8) A short conclusion, stating the precise relief sought.

Tenn. R. App. P. 27(a) (emphasis added). Respectfully, it is manifest that the Plaintiff's appellate argument is inadequate in light of these requirements and largely frustrates our ability to review the raised, albeit generally amorphous, issue connected to the trial court's summary judgment dispositions. The inadequacies in the Plaintiff's briefing are particularly inhibiting of our review when considering the fact that the record transmitted to us contains multiple summary judgment orders entered throughout the course of the trial court proceedings, some of which we have not even specifically discussed herein. Indeed, we are largely left to speculate as to what specific errors the Plaintiff perhaps envisions to exist vis-à-vis the various summary judgment orders that were entered.

The Defendants correctly note that the lack of appropriate briefing can subject raised issues to a finding of waiver on appeal. As the Tennessee Supreme Court has explained, "It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Resp.*, 301 S.W.3d 603, 615 (Tenn. 2010). Here, we are of the opinion that a finding of waiver with respect to this issue is generally appropriate. As discussed above, we are largely left to speculate as to the specific nature of the Plaintiff's claimed grievances relative to the various summary judgment orders with which he ostensibly takes issue. This, no doubt, frustrates our ability to review this case and provide the Plaintiff with meaningful relief, assuming *arguendo* it might be justified as to the summary judgment orders that were entered. With that said, we conclude that the nature of the Plaintiff's challenge to the trial court's February 9, 2021, summary judgment order in favor of Dr. McLean is sufficiently discernible to us given the larger context of the Plaintiff's brief and his raised issue concerning a desired replacement expert for Dr. Sobel. Indeed, although the Plaintiff's argument leaves much to be desired to the extent that it relates to the February 9, 2021, summary judgment order, the briefing deficiencies that otherwise exist are not a death knell to our ability to understand the alleged impropriety in allowing the February 9, 2021, order to stand. As noted previously, the February 9, 2021, summary judgment order was predicated upon the trial court's conclusion that there was "no genuine

---

[1] In addition to the other deficiencies discussed herein, we observe that the Plaintiff's brief fails to state the applicable standard of review governing his desired summary judgment review.

- 9 -

issue as to the material fact of whether Dr. McLean complied with the recognized standard of acceptable professional practice." Of course, through the present appeal, the Plaintiff endeavors to show that he should have been allowed to obtain a substitute standard of care expert after Dr. Sobel refused to testify in this case. We therefore understand how the Plaintiff's establishment of an error associated with that issue would impact the foundations of the February 9, 2021, summary judgment order in favor of Dr. McLean. It is only in this limited respect, and in the absence of any further developed explanation by the Plaintiff, that we are able to intelligibly derive any meaning in the Plaintiff's otherwise vague arguments that the "effect of the . . . erroneous decision[] [in the trial court] . . . resulted" in summary judgment and that the "motion[] for summary judgment could not have been granted but for" error already existing.

Public policy favors resolving cases on their merits, *see Norton v. Everhart*, 895 S.W.2d 317, 322 (Tenn. 1995), and the presence of inadequate briefing does not necessarily foreclose this Court from proceeding to review the merits of an issue. Rule 2 of the Tennessee Rules of Appellate Procedure, in fact, permits this Court to waive briefing requirements if good cause exists. *See* Tenn. R. App. P. 2 (noting that, subject to certain exceptions, "[f]or good cause . . . the Court of Appeals . . . may suspend the requirements or provisions of any of these rules in a particular case . . . and may order proceedings in accordance with its discretion"); *Chiozza v. Chiozza*, 315 S.W.3d 482, 489 (Tenn. Ct. App. 2009) ("[T]here are times when this Court, in the discretion afforded it under Tenn. R. App. P. 2, may waive the briefing requirements to adjudicate the issues on their merits."). Given our ability to discern limited meaning in the Plaintiff's argument relative to the February 9, 2021, summary judgment order, as discussed above, we are of the opinion that the February 9, 2021, summary judgment order in favor of Dr. McLean is an appropriate subject of our review notwithstanding the briefing deficiencies that otherwise exist. We stress, however, that litigants should not construe our decision in this case to attempt to tackle the merits of that order as a harbinger that we will be as forgiving of similar briefing deficiencies in the future.

To synthesize our discussion above, we hold that the Plaintiff has generally waived any issue he has concerning the summary judgment orders that were entered in this case given his brief's deficiencies and noncompliance with the rules of appellate procedure. We do not extend our finding of waiver, however, to the Plaintiff's challenge to the February 9, 2021, summary judgment order, the entry of which was predicated upon the Plaintiff's lack of expert proof as to the standard of care required of Dr. McLean. As a consequence of the Plaintiff's waiver, we leave the summary judgments entered in favor of the hospital entirely undisturbed. As for the February 9, 2021, summary judgment order in favor of Dr. McLean, which is the only summary judgment order we find appropriate to review in light of the Plaintiff's submitted briefing, we turn to that issue below in connection with our review of the Plaintiff's raised issue concerning a desired substitute standard of care expert.

- 10 -

As discussed previously, the trial court denied the Plaintiff's efforts to secure a substitute expert after Dr. Sobel refused to testify in this case. The Plaintiff had contended that a substitution would be proper given that Dr. Sobel was no longer available. Further, the Plaintiff had argued that his desired replacement for Dr. Sobel, Dr. Lunders, had opinions that were "for the most part identical."

The trial court's decision here, which concerned the Plaintiff's efforts to secure a new expert after the deadline set in the scheduling order, is subject to review for an abuse of discretion. Discretion itself

> denotes the absence of a hard and fast rule. When invoked as a guide for judicial action, it requires that the trial court view the factual circumstances in light of the relevant legal principles and exercise considered discretion before reaching a conclusion. Discretion should not be arbitrarily exercised. The applicable facts and law must be given due consideration. *Langnes v. Green,* 282 U.S. 531, 541, 51 S.Ct. 243, 247, 75 L.Ed. 520, 526 (1931). An appellate court should not reverse for "abuse of discretion" a discretionary judgment of a trial court unless it affirmatively appears that the trial court's decision was against logic or reasoning, and caused an injustice or injury to the party complaining. *Douglas v. Estate of Robertson,* 876 S.W.2d 95, 97 (Tenn.1994); *Foster v. Amcon Intern.,* 621 S.W.2d 142, 145 (Tenn.1981).

*Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996).

When addressing the propriety of the Plaintiff's request for relief in this case, the trial court specifically considered the factors in *Williams v. Baptist Memorial Hospital*, 193 S.W.3d 545 (Tenn. 2006). The *Williams* court, which had observed that Rule 6.02 of the Tennessee Rules of Civil Procedure permits a court, upon a showing of excusable neglect, to allow an enlargement of time requested after the original time has elapsed, adopted the following considerations as relevant to its inquiry regarding a request for an enlargement of time to identify expert witnesses: "(1) the risk of prejudice to parties opposing the late filing, (2) the delay and its potential impact on proceedings, (3) the reasons why the filings were late and whether the reasons were within the filer's reasonable control, and (4) the good or bad faith of the filer." *Id.* at 551.

In connection with its consideration of the above-mentioned factors from *Williams* during a hearing on the Plaintiff's motion for a substitute expert, the trial court noted in pertinent part as follows:

> One, the risk of prejudice to the Defendant in either the Williams case
> or the Mikheil case, one of the factors considered was that the physician had,

and I quote, "been under a cloud of the lawsuit for two years." In this case, we're dealing with something that has gone on for significantly more than two years, and if the Court granted this supplementation and/or the extension of the deadline, the Court finds that the risk of prejudice to this Defendant, these Defendants, would exceed that as set forth in the Mikheil or Williams case.

The delay and the potential impact being the second factor, the Court will make certain findings relative to that. One, the delay will be significant if I grant this. Based -- going on the Court's calendar, available trial dates, counsel's calendar, and redeposing an expert or deposing an expert in an investigation relative to this expert, that being the one that is being proposed to be supplemented. And the Court finds that that weighs in favor of the denial of the supplementation.

The third factor, the reasons why there is the request and whether it was within the filer's control. In this case, the Court finds that Plaintiff's counsel had some control over the testimony of the physician, Dr. Sobel, but certainly not complete control. I think Dr. Sobel -- and I find that Dr. Sobel's testimony in the deposition was at best misleading and at worst fraudulent. So it's somewhere between those two on this continuum. But [the Plaintiff's counsel] didn't know about it, neither one of them, and I certainly do not fault them at all in this. That would weigh slightly in favor of granting this request. I do not find that there was a -- that this was done in bad faith.

In a subsequently-entered order memorializing its decision to deny the Plaintiff's motion to substitute, the trial court revisited these considerations, stating in part:

First, the Court finds that the risk of prejudice to the Defendants is great in this matter. Defendant McLean has been under the suspicion of a lawsuit for significantly more than two years. If the Court granted Plaintiff's Motion to Substitute Expert Witness and/or the extension of the deadline, the risk of prejudice to Defendants would exceed that set forth in *Williams* and *Mikheil*.

Second, the Court finds that the delay in this matter would be significant if Plaintiff's Motion to Substitute is granted. If the Court were to grant Plaintiff's Motion to Substitute, the trial date would be pushed out significantly due to the Court's calendar, available trial dates, the calendars of counsel, and the need to take another expert deposition despite the fact that the discovery deadlines have expired in this matter. The Court finds that the significant delay that would result if Plaintiff's Motion to Substitute is granted weighs in favor of the denial of Plaintiff's Motion to Substitute.

- 12 -

The risk of prejudice to Defendants and the significant delay that would result if the Court granted Plaintiff's Motion to Substitute weigh in favor of denying Plaintiff's Motion.

Third, the Court looks at the reasons why there is a request and whether it was in the filer's control. In this case, the Court finds that Plaintiff's counsel had some control over the testimony of the physician, Dr. Sobel, but Plaintiff's counsel did not have complete control. The Court finds that Sobel's testimony during his deposition was at best misleading and at worst fraudulent. The Court does not assess fault to Plaintiff's counsel for Dr. Sobel's testimony. The fact that Plaintiff's counsel did not have complete control over this situation weighs slightly in favor of granting Plaintiff's Motion to Substitute Expert. The Court finds, however, that as a practical matter that anytime someone finds that an expert has done something that bears on their credibility that the relationship between the lawyer that hired them and that particular expert is going to deteriorate.

We are of the opinion that the trial court's ruling here constituted an abuse of discretion. Although the trial court generally referenced a potential risk of prejudice and delay that could be occasioned by allowing the Plaintiff's new expert, it should be noted that the Plaintiff was proposing to merely substitute Dr. Lunders' opinions for Dr. Sobel's. The Plaintiff was not proposing to inject entirely new issues into the case. Dr. Sobel, of course, had *refused* to testify, and a replacement for him was needed. Although Dr. Sobel's refusal to testify was arguably assumed by the trial court's written order inasmuch as the deterioration of the relationship between Dr. Sobel and the Plaintiff's counsel was referenced, it was never specifically discussed. Indeed, instead of specifically focusing on whether the Plaintiff had control over Dr. Sobel's refusal to testify, which itself prompted the need for a substitute expert, the trial court focused more narrowly on Dr. Sobel's deposition testimony and whether Plaintiff's counsel had control over it or was at fault for it. As noted above, as to these considerations, the trial court opined that the Plaintiff's counsel had "some control" over Dr. Sobel's testimony but was not at fault for it. It is not clear to us in what sense the trial court believed "some control" to exist in relation to Dr. Sobel's testimony, and we note again that the court ultimately concluded that the Plaintiff's counsel bore no fault for what Dr. Sobel had stated. As best as we can understand, the partial control contemplated by the court's order perhaps refers to counsel's pre-deposition preparation, or lack thereof, of Dr. Sobel.

Although the trial court's written order did not specifically consider whether the Plaintiff had any control over Dr. Sobel's refusal to testify or even specifically mention the fact of Dr. Sobel's refusal to testify, the order did arguably appear to assume his unavailability to the Plaintiff inasmuch, as noted earlier, the court referenced a deterioration of the relationship between Dr. Sobel and the Plaintiff's counsel. Indeed,

after commenting that the Plaintiff's lack of complete control[2] weighed slightly in favor of granting the Plaintiff's motion, the trial court went on to state as follows: "[H]owever, that as a practical matter that anytime someone finds that an expert has done something that bears on their credibility that the relationship between the lawyer that hired them and that particular expert is going to deteriorate." Interestingly, when this "practical" consideration was referenced by the trial court at the hearing on the Plaintiff's motion to substitute, the court not only considered Dr. Sobel's refusal to testify specifically, it actually appeared to disclaim any finding that the Plaintiff had sought to manufacture a withdrawal after Dr. Sobel's deposition due to the doctor's potential credibility concerns, while at the same time alluding to such general theoretical concerns as a "practical" consideration that should countenance against granting relief in this case. Insofar as its offered insight admits, the trial court placed emphasis on concerns that *could* exist or manifest in these types of situations. Indeed, immediately after remarking that there was no bad faith or fault on the part of the Plaintiff's counsel here, the court went on to state as follows:

> **However, I want to look at this from a practical standpoint**. Any time someone finds that an expert has done something that bears on their credibility -- **I'm not saying the lawyers did this in this case**, but because that expert's credibility is -- can be or will be greatly impugned, I think the relationship between the lawyer that hired them and that particular expert is going to deteriorate. I mean, common sense tells you that. **And <u>if</u> the lawyer then can come in and say it's deteriorated, he's not credible, I've cussed him like a dog because he wasn't credible, and now he -- because of this, he's not going to testify or she's not going to testify** so give me another bite, then I think I'm in great degree frustrating Rule 16.

(emphases added).

Obviously, a counsel's efforts to manufacture an expert's withdrawal could be a relevant consideration to the extent such efforts would tend to show control over and impact on an expert's subsequently-stated unwillingness to testify, but the trial court made no written finding that, in this case, the Plaintiff's counsel had acted in such a way to facilitate Dr. Sobel's refusal to testify. Moreover, beyond the absence of any written finding to this end, the trial court's oral statements at the hearing on the Plaintiff's motion to substitute indicated that it was broaching that concern "as a practical consideration" regarding facts that could present themselves, specifically noting that "I'm not saying the lawyers did this in this case." The court then, as noted above, appeared to allude to this "practical matter" in its order.

---

[2] Again, the specific focus in the order appeared to be on the Plaintiff's control over Dr. Sobel's deposition testimony, not control over (or a contribution to) his stated refusal to testify. The latter inquiry would appear to be a broader one than one limited to considerations of control over Dr. Sobel's deposition testimony.

As it is, the record contains no finding from the trial court that the Plaintiff or his counsel acted in bad faith or was at fault here, and insofar as this record suggests, the Plaintiff did not have control over Dr. Sobel's actual decision to refuse to testify. It therefore appears that the Plaintiff's need for a replacement expert outside the scheduling order deadline was not within his control. Of note, when a party misses a deadline due to circumstances outside of its control, this will often be sufficient to substantiate a claim of excusable neglect. *See State ex rel. Sizemore v. United Physicians Ins. Risk Retention Grp.*, 56 S.W.3d 557, 567 (Tenn. Ct. App. 2001) (noting that "a party's failure to meet a deadline may have causes ranging from forces beyond its control to forces within its control" and that "[t]he former will almost always substantiate a claim of excusable neglect"). We conclude that such a showing of excusable neglect was made here in light of the above discussion and hold that the trial court abused its discretion in not allowing the Plaintiff to use Dr. Lunders as a substitute expert for the standard of care opinions already previously injected into the case through Dr. Sobel.

In connection with our conclusion on this issue, we note that some of the arguments offered by Dr. McLean in defense of the trial court's decision misapprehend the record, facts of this case, and circumstances surrounding the Plaintiff's motion to substitute. First, we observe that Dr. McLean takes issue with the timeliness of the Plaintiff's motion to secure a substitute expert for Dr. Sobel, generally arguing, for instance, that "Plaintiff was aware of potential issues with Dr. Sobel for nearly a year before he sought leave to substitute." Respectfully, Dr. McLean's argument on this issue fails to appreciate that the Plaintiff's motion was predicated on Dr. Sobel's actual refusal to testify and withdrawal from the case, and the record certainly does not reveal any marked untimeliness associated with the Plaintiff's request. An affidavit from the Plaintiff's counsel indicates that Dr. Sobel quit on January 16, 2019; the motion to substitute was filed shortly thereafter on January 22, 2019.

Dr. McLean further argues that the motion to substitute is without merit because, as he attempts to suggest through various statements, Dr. Sobel is not prevented from testifying in this matter. For example, he argues that the "desire to avoid an expert's credibility problem is an insufficient reason to substitute an expert." Notwithstanding the merit that this proposition may otherwise hold, this record does not suggest that the motion to substitute was animated by this reason. The trial court made no finding that the claimed withdrawal of Dr. Sobel was a subterfuge and that the doctor was actually available to the Plaintiff. Moreover, the trial court placed no blame on the Plaintiff's counsel for any of the events that transpired. Dr. Sobel became uncooperative and refused to testify on behalf of the Plaintiff, and the Plaintiff had a true need for another expert independent of potential concerns that previously existed as to Dr. Sobel. As counsel for the Plaintiff explained at the hearing on his motion to substitute:

> [Defense counsel] argue over and over and over again . . . that the tension
> between Plaintiff's counsel and Dr. Sobel is nothing new, and they're right,

it's not. But the tension isn't why we're here today. **We acknowledged that there were problems. We were prepared to go to trial with those problems, despite that tension**. **The thing that's new is he's now quit and refuses to testify**. But when the Court ordered him to produce the 1099s under protective order, there was some tension. When the Court lifted the protective order, there was more tension. But as strained as that relationship was, we were prepared to go to trial with him. We had no other choice. That's all changed since he's not coming.

(emphasis added).

Our conclusion that the trial court erred in refusing the Plaintiff a substitute expert for Dr. Sobel is, as alluded to previously, relevant to our consideration of the February 9, 2021, summary judgment order, the entry of which was predicated upon the Plaintiff's lack of expert proof as to the standard of care required of Dr. McLean. Simply put, given our conclusion above that the trial court erred in ruling that Dr. Lunders should not be allowed as a substitute for Dr. Sobel, the February 9, 2021, summary judgment order is hereby reversed.[3]

*Assertion of Comparative Fault Defense and Ensuing Limitations on Any Experts Retained by the Plaintiff to Address the Defense*

We turn next to the Plaintiff's contention that the trial court erred in (1) allowing the pleadings to be amended for the assertion of a comparative fault defense against him and (2) placing limitations on any new experts the Plaintiff might retain to address this defense.

"The rules relating to amendment of pleadings are liberal, vesting broad discretion in the trial court." *Biscan v. Brown*, 160 S.W.3d 462, 471 (Tenn. 2005). Indeed, regarding the amendment of pleadings, Rule 15.01 of the Tennessee Rules of Civil Procedure specifically states that "leave shall be freely given [to amend pleadings] when justice so requires." Tenn. R. Civ. P. 15.01. This Court has accordingly explained that the trial court has discretion to "allow the defendant to amend his answer, even to assert an affirmative defense, and 'even if such a motion is not made until the time of trial.'" *Small ex rel. Russell v. Shelby Cty. Schs.*, No. W2007-00045-COA-R3-CV, 2008 WL 360925, at *15 (Tenn. Ct. App. Feb. 12, 2008) (quoting *Reed v. Alamo Rent-A-Car, Inc.*, 4 S.W.3d 677,

---

[3] Given our decision to reverse the final summary judgment order in favor of Dr. McLean, we pretermit consideration of the Plaintiff's raised issue concerning a desired nonsuit of Dr. McLean, which, at most, appears to have been raised in the appellate briefing as an alternative issue and remedy to the Plaintiff's request that the summary judgment order in Dr. McLean's favor be reversed. Indeed, whereas Rule 27(a)(8) of the Tennessee Rules of Appellate Procedure requires that an appellant's brief contain "[a] short conclusion, stating the precise relief sought," the conclusion in the Plaintiff's brief mentions nothing of a desire for a voluntary dismissal of the claims that had remained against Dr. McLean; instead, the brief concludes by asking for a "trial on the merits" but nothing more.

691 (Tenn. Ct. App. 1999)). Considerations relevant to determining whether a court abused its discretion are "whether the amendment would cause undue delay; whether the opposing party has sufficient notice; whether the party seeking the amendment is acting in bad faith; whether the deficiencies have not been cured in previous amendments; whether the amendment would be futile; and whether the amendment would cause undue prejudice." *Id.* at \*16.

Here, we discern no abuse of discretion in the trial court's decision to allow the amendment complained of by the Plaintiff. We observe that Dr. McLean's request to assert a comparative fault defense was filed in the wake of deposition testimony by one of the Plaintiff's experts indicating that the Decedent "would probably be alive" had he sought earlier treatment, and we additionally note that Dr. McLean's motion was filed within the contemplated timeframe that the parties' agreed scheduling order had set for motions to amend the pleadings.[4]

Although we find no error in the trial court's decision to allow the assertion of a comparative fault defense against the Plaintiff, we do take issue with, and are somewhat perplexed by, the limitations imposed on the Plaintiff regarding new experts he might retain to address this new defense. As outlined previously, following the pleaded assertion of the comparative fault defense against the Plaintiff and a subsequent status conference, the trial court entered an order that initially provided that "[a]ny new expert identified by Plaintiff may be disclosed to address only the issue of [the Decedent's] comparative fault." The written text of the court's order went on to further state, however, that "Plaintiff may not identify or use any new experts to address the standard of care for Defendants or alleged violations of the standard of care by Defendants. Plaintiff is not permitted to present any new experts to testify about the alleged fault of Defendant McLean and/or what he allegedly did wrong." To the extent that the trial court was attempting to prevent the Plaintiff from obtaining new expert opinions that the standard of care was violated in ways other than those that had already been alleged and disclosed, we certainly take no issue with the court's attempt to prevent a "backdooring" of *new* standard of care issues into the case. However, the terms of the trial court's order clearly prohibit any new expert from addressing, in any way, any alleged standard of care violations of Dr. McLean and his alleged wrongful actions, even those that already are in issue. In our view, this limitation constitutes an abuse of discretion, as it in effect prevents the Plaintiff from meaningfully responding to the new defense that the Decedent is to blame for the death that resulted in this case. Indeed, how would the Plaintiff be able to effectively counter Dr. McLean's defense that the Decedent's actions were a cause of the harm complained of in this case if the new expert allowed by the court for this issue is not permitted to offer an opinion that

---

[4] The relevant deadline pursuant to the terms of the agreed scheduling order was January 1, 2018. Whereas Dr. McLean's motion to amend was actually filed on January 2, 2018, January 1 was a holiday. *See* Tenn. R. Civ. P. 6.01 (noting that, when computing a period of time prescribed or allowed by order of court, the last day of the period shall not be included if, among other things, it is a "legal holiday as defined in Tenn. Code Ann. § 15-1-101"); Tenn. Code Ann. § 15-1-101 (specifying January 1 as a holiday).

actions other than the Plaintiff's, such as Dr. McLean's, were the cause of the injury? By restricting any new expert from even broaching the alleged wrongful actions of Dr. McLean, the court's order narrowly circumscribes the universe of the case and prevents any meaningful or intelligible inquiry into the issue implicated by the comparative fault defense, i.e., whether the Decedent is responsible for what occurred. After all, the Plaintiff could, in the absence of the court's limitations, respond to the assertion that the Decedent's actions resulted in his death by offering expert testimony that the Decedent's alleged negligence played no causal factor in the medical events but that Dr. McLean's actions did.

The trial court acknowledged during one hearing that the injected issue of comparative fault "change[d] the complexion of the case from the plaintiff's standpoint." Yet, while the trial court purported to allow the Plaintiff to respond to the new defense, which alleged that the Decedent's negligence was a cause of his death, the court's order improperly restricted the Plaintiff from offering any holistic assessment to that specific contention. For instance, under the terms of the order, a cardiologist, who the court recognized might now be needed by the Plaintiff given the shift in the nature of the case,[5] would not be permitted to explain that the Decedent's actions made no difference here but that, instead, Dr. McLean's actions were in fact the cause of the Decedent's death. Any such comprehensive consideration is entirely foreclosed per the terms of the order inasmuch as alleged standard of care violations by Dr. McLean cannot even be "address[ed]." Although the Plaintiff attempted to get the trial court to change its position, arguing that its order merely allowed him to "get a new expert limited to saying that [the Decedent] is not at fault," the trial court denied the request that its limitations be lifted.[6] Because we conclude that the imposed limitations constitute an abuse of discretion on the part of the trial court, the Plaintiff should be allowed, in response to the comparative fault defense, to obtain an expert that is not restricted from commenting on the actions of Dr. McLean.

---

[5]We observe that the trial court had stated that it granted a continuance "to allow Plaintiff to obtain a cardiologist to respond to the Defendants' comparative fault allegation as to [the Decedent]."

[6] The trial court did not, as part of its denial, disabuse the Plaintiff in any way of the understanding the Plaintiff had gleaned from the initial order that imposed the limitations. Moreover, as explained herein, because the order at issue limits the expert(s) from even *addressing* alleged standard of care violations, it does prevent them from discussing whether the actions of Dr. McLean were a cause of the injury. It is not entirely clear to us whether the trial court intended to place such a severe limitation, or that Dr. McLean's counsel even believed such a limitation should exist. For instance, during a hearing following the entry of the order at issue, the trial court noted that it was allowing the Plaintiff to "get a cardiologist to say . . . it all would have been the same [had the Decedent done certain things the evening before his death]." Moreover, counsel for Dr. McLean expressed the belief that the Plaintiff "can have a cardiologist . . . on causation." Of course, per the terms of the order imposing limitations, to the extent causation was allowed to be addressed by a new expert, such an inquiry could not address alleged standard of care violations by Dr. McLean. Thus, the complained-of actions of the doctor could not be considered by that new expert as part of any causation inquiry, leaving the Plaintiff to reasonably understand that his new expert could only look to alleged negligence by the Decedent. Yet, as we have noted earlier, the trial court refused to disturb the limitations in its order when the issue was brought to its attention.

**CONCLUSION**

As discussed herein, we hold that the Plaintiff has generally waived any issue he has concerning the summary judgment orders that were entered in this case given his brief's deficiencies and noncompliance with the rules of appellate procedure. Despite his brief's deficiencies, however, we have endeavored to specifically address the trial court's February 9, 2021, summary judgment order, the entry of which was predicated upon the Plaintiff's lack of expert proof as to the standard of care required of Dr. McLean. Given our conclusion herein that the trial court erred in ruling that Dr. Lunders should not be allowed as a substitute for Dr. Sobel, the February 9, 2021, summary judgment order is hereby reversed. Although we discern no error in the trial court's decision to allow the comparative fault defense amendment complained of by the Plaintiff, we conclude that the court did err with regard to the limitations it imposed on any new experts the Plaintiff might retain to respond to this new defense. The case is remanded for further proceedings that are necessary and consistent with this Opinion.

    s/ Arnold B. Goldin         
ARNOLD B. GOLDIN, JUDGE
